[No. D060974. Fourth Dist., Div. One. Sept. 27, 2012.]

In re DENISE SHIGEMURA on Habeas Corpus.

## COUNSEL

Law Office of Charles Carbone and Charles F. A. Carbone for Petitioner Denise Shigemura.

Kamala D. Harris, Attorney General, Jennifer A. Neill, Assistant Attorney General, Anya M. Binsacca, Sara J. Romano, Julie A. Malone, Amanda Lloyd and Linnea D. Piazza, Deputy Attorneys General, for Respondent the People.

## OPINION

**BENKE, Acting P. J.**—In this case the Board of Parole Hearings (the board) denied an inmate's application for a parole date and she challenged the denial by way of a petition for a writ of habeas corpus, which the trial court granted. The warden of the prison where the inmate is incarcerated filed a timely notice of appeal.[1] We reverse.

---

[1] Although the inmate's habeas corpus petition challenged the *board's* decision, Penal Code section 1477 requires a petition for a writ of habeas corpus "be directed to the person having custody of or restraining the person on whose behalf the application is made."

The board denied the inmate a parole date principally on the grounds the inmate had not adequately demonstrated insight into the reasons she participated in the brutal strangulation and bludgeoning of the victim, who had been a friend of both the inmate and the other two participants in the victim's murder. We believe the record, considered in the light of the deference courts must accord decisions of the board, fully supports the board's decision.

The murder occurred after the inmate's former boyfriend lured the victim into a car the inmate was driving and strangled the victim while the inmate kept driving. The murder took place because the inmate's former boyfriend believed that murdering the victim was the only means of protecting himself, his current girlfriend and the inmate from a methamphetamine dealer who had frightened them and who they also planned to murder.

In light of the murderers' paranoid and delusional belief system and its obvious power over the murderers, the board could reasonably conclude that, in making statements to the effect she simply should have said "no" to her former boyfriend while the murder was taking place, the inmate had no realistic appreciation of her own active role in the murder and the powerful psychological forces acting upon her and the other participants at the time of the life crime. That lack of insight in turn supports the board's ultimate conclusion that the inmate remains a risk to public safety.

Accordingly, we must reverse the order granting the inmate's petition and direct the trial court to enter a new order denying the petition.

## FACTUAL AND PROCEDURAL BACKGROUND[2]

### 1. *Inmate's Background*

Petitioner Denise Shigemura was 22 years old at the time of the life crime, which occurred on May 15, 1991. Shigemura's life up to that point in time had, in many respects, been difficult. As Shigemura freely admits, many of the difficulties she faced were of her own making.

Shigemura was the second of three children born to a father of Japanese ancestry and a Caucasian mother. Shigemura reported that although she was not physically abused, her father was an alcoholic and her father's family had little respect for her Caucasian mother, whom they treated as a slave.

Although Shigemura's siblings were successful in school, she left high school at 15, when she gave birth to her first daughter. Shigemura passed the

---

[2] We grant the warden's motion to strike exhibit C to petitioner's brief. Exhibit C, a statement of responsibility, was not considered by the trial court.

general educational development test at 17 and joined the Navy, where she was trained as a paramedic. While she was in the Navy, Shigemura married another member of the Navy and had a second daughter. However, Shigemura's husband began physically abusing her and as their relationship deteriorated, she began using methamphetamine.

In 1990, during one altercation between Shigemura and her husband, a neighbor and acquaintance, Robert Jurado, intervened to protect Shigemura and compel Shigemura's husband to leave the scene of the altercation. Shigemura and her husband separated and later divorced and Shigemura began a romantic relationship with Jurado. Although Jurado had an ongoing relationship with a then 16-year-old girl, Anna Humiston, Shigemura and Humiston each accepted Jurado's relationship with the other and considered themselves sisters.

After her separation from her husband, Shigemura was honorably discharged from the Navy. However, Shigemura was not eligible for reenlistment.

Jurado was a methamphetamine user and distributor and Shigemura and Humiston were both using methamphetamine at the time of their respective relationships with Jurado. While involved with Jurado and after she separated from her husband, Shigemura left her two small children in the care of her former in-laws, who resided in the state of New York.

In late 1990 Shigemura was arrested at a naval base in San Diego after methamphetamine and firearms were discovered in a vehicle she attempted to drive onto the base. Shigemura was convicted of drug possession and served seven months at the San Diego Metropolitan Correctional Center (MCC).

In the spring of 1991 Shigemura was released from MCC to a local halfway house and began a full-time job. Shigemura planned to transition from the halfway house to a home with two friends, Brian Johnsen and his girlfriend Theresa Holloway, the victim of the life crime. Holloway and Johnsen were also friends of Jurado and Humiston.

Shigemura has consistently stated that by the time she left MCC in the spring of 1991 her romantic relationship with Jurado had ended, she was no longer using methamphetamine and she was determined to remain drug free. However, on weekends, when she was permitted to leave the halfway house, Shigemura stayed at Johnsen's house and continued to associate with Jurado and Humiston.

## 2. *Life Crime*

### A. *Motivating Events*

On a weekend in May 1991, while Shigemura was staying at Johnsen's home, another methamphetamine user and distributor, Douglas Mynett, came to Johnsen's home, woke Shigemura up and accused her of taking money he had left in a bedroom. Mynett had a reputation for violence and his accusation frightened Shigemura. Mynett was known to sell drugs to Hells Angels and previously Mynett had kidnapped Jurado and held him for ransom because of money Jurado owed Mynett. Shigemura told Mynett she did not take his money and went back to sleep. When she woke up she discovered Mynett had taken her purse.

Shortly after discovering the theft, Shigemura received a telephone call from someone looking for Mynett. The caller told Shigemura Mynett owed the caller money. This call sent Shigemura into a panic. By her own account, Shigemura concluded the person or persons to whom Mynett owed money would come after her, Jurado and Humiston because she believed Mynett would tell them Shigemura and the others had taken his money. Johnsen, who was in jail on a driving under the influence charge, called Shigemura who related what had happened. Johnsen in turn contacted Jurado and told him to pick up Shigemura.

Jurado came to Johnsen's house, picked up Shigemura and took her to their friend Mark Schmidt's house. Shigemura told Jurado what had happened and Jurado told Shigemura he owed Mynett money and he too was very concerned about what Mynett would do to them and their families. Jurado and Shigemura became convinced they had to kill Mynett. They had a three-way conversation with Johnsen in which they agreed on a plan to kill Mynett.

Holloway was present at Schmidt's house along with Humiston. Jurado and Shigemura did not disclose to Holloway the plan to kill Mynett, because they believed Holloway would "snitch" them off to Mynett. Holloway, however, was very curious about what was going on and asked Jurado, Shigemura and Humiston a lot of questions about Mynett.

The following day, Shigemura, Jurado, Humiston and Holloway were once again at Schmidt's house and Johnsen again called from jail. Johnsen spoke to Holloway and told her "everything." Jurado immediately concluded that they would have to kill Holloway and asked Schmidt if he had any rope.

### B. *The Killing*

After Holloway found out about the group's plan to kill Mynett, Shigemura became more frightened and decided to go back to her halfway house.

However, Shigemura did not have access to a vehicle and Jurado and Humiston agreed to take Shigemura to the halfway house.

Upon walking out of Schmidt's house and after Jurado had asked Schmidt for a rope, Shigemura volunteered to drive the car Jurado and Humiston were using. Shigemura explained she volunteered because Humiston was too upset to drive. According to Shigemura's version of events, she got in the driver's seat, Humiston got in behind Shigemura and Holloway got in the front seat next to Shigemura. Jurado got in the backseat behind Holloway.

Shigemura began driving toward her halfway house knowing Jurado wanted to kill Holloway, had asked Schmidt for a rope, and was sitting behind Holloway in the car. While Shigemura was driving, Jurado put the rope around Holloway's neck and began strangling her. Holloway struggled and yelled "Why. Tell me why?" At one point, while Shigemura was still driving, Jurado pulled Holloway into the backseat of the car and Humiston got in the front seat. Shigemura began having trouble driving the standard shift car and Jurado told Shigemura to pull to the side of the 163 freeway near Balboa Park. Jurado pulled Holloway out of the car and threw her into a ditch near the freeway. Juardo then went into the ditch to make sure Holloway was dead and hit Holloway in the head several times with a tire jack.[3]

### C.   *Attempts to Avoid Detection and Apprehension*

When Jurado came out of the ditch, Jurado, Shigemura and Humiston tried without success to leave in the car but it would not start. They pushed the car away from the location of the body and then walked up a hill where a passerby gave them a ride. At some point after the killing, they got some food and shot pool.

The following day, a tow truck recovered the car for them. Because the inside of the car was covered with Holloway's blood, Shigemura and Humiston cleaned it.

Shigemura had not returned to the halfway house and had missed her curfew. In order to explain her absence, she told the halfway house she had

---

[3] In *People v. Superior Court (Jurado)* 4 Cal.App.4th 1217, 1224 [6 Cal.Rptr.2d 242], in which we found sufficient evidence to support a special-circumstance lying-in-wait allegation against Jurado, based on the record in that case we described a lengthier period of time between the decision to kill Mynett and Holloway's death: "Approximately a week prior to the murder, both Jurado and his girlfriend, Shigemura, made efforts to obtain a gun. Jurado needed the gun in order to 'take care of somebody,' by which he meant to kill someone. Shigemura wanted the gun to 'take care of a problem.' "

been beaten up by three men in an alleyway near Schmidt's house and Jurado inflicted a number of bruises on Shigemura's arm to corroborate her alibi.

On the morning of May 17, 1991, a motorist was stranded on the 163 freeway near the ditch where Holloway's body was thrown. The motorist noticed Holloway's body and called police. An autopsy concluded Holloway died of strangulation and blunt force head injuries. She was 17 weeks pregnant.

Humiston told another juvenile about what had happened to Holloway and that she was killed because she had got Humiston and the others into a lot of trouble and had been snitching on them a lot. The juvenile contacted police and related what Humiston had told her. Police in turn contacted Jurado, Humiston and Shigemura. The three participants initially denied involvement in the murder, but when confronted with physical evidence and other information police had discovered, each admitted participating in Holloway's killing.

Shigemura pled guilty to first degree murder and was sentenced to a term of 25 years to life.

### 3. *Postconviction Conduct*

By her own admission, Shigemura only began a serious effort to change her life after being disciplined in 1994 for fighting with a girlfriend. Since then, however, she has actively participated in a 12-step program, obtained a two-year associate of arts degree from a community college and earned a drug and alcohol counseling certificate. During her incarceration, Shigemura participated in a number of self-help groups and prison organizations, including veterans support, narcotics anonymous, conflict resolution through alternatives to violence, grief share, substance abuse, anger management, parenting, and women's advisory council.

Shortly before the 2010 board hearing, which is the subject of this appeal, Shigemura was examined by a psychologist. According to the psychologist, Shigemura blames her low self-esteem, the peers she chose, and her fear of Jurado for her participation in Holloway's death. Shigemura stated: "I blame myself a lot . . . for being there and not stopping it."

With respect to Shigemura's exploration of the commitment offense and her ability to come to terms with its underlying causes, the psychologist stated: "Ms. Shigemura has had many years to contemplate her crime. She has demonstrated a commitment to self-reflection and self-improvement, as evidenced by years of participation in educational programs, therapy and self-help groups. She appears to have given the commitment offense a great

deal of thought. She has explored the ways in which she allowed the offense to take place, including succumbing to negative peer influence; depression (including feelings of hopelessness, lack of motivation or drive, and low self-esteem); passivity and lack of assertiveness skills; problematic substance use; and failure to ask for help. She expressed guilt and remorse for having contributed to the victim's death. Ms. Shigemura is not using the fact that she was a relatively passive participant in the offense as an excuse to minimize her level of responsibility in the crime nor does she question her sentence."

### 4. *Parole Hearing*

At the parole hearing, Shigemura again expressed her remorse for participating in Holloway's death and discussed how she has become more assertive and independent. Shigemura agreed that a written statement about the life crime she had prepared accurately reflected her feelings. However, for the most part, Shigemura exercised her right not to discuss the life crime. Shigemura did tell the panel that while Jurado was killing Holloway in the car next to her while she was driving, she felt paralyzed and could not think.

The San Diego County District Attorney vigorously opposed Shigemura's request for a parole date. In particular, the district attorney directly challenged Shigemura's narrative in which she portrayed herself as a passive participant whose principle culpability was her failure to stop Jurado. The district attorney stated: "You know, there's been talk before in previous hearings and in the record about how she wasn't really an active participant, and really didn't know what's going on. *That's absolutely untrue.* At page 10 of the original probation officer's report, there's an indication back at the time of the offense, again, that she knew about the crime ahead of time. She was the wheel person for this crime. I mean, somebody had to drive this vehicle in order for this victim to be strangled the way she was, and beaten to death. And she was the person who willingly drove that vehicle for that particular purpose, and we find it absolutely outrageous and horrifying that this has never really been fully fleshed out or explored in any meaningful way. I mean, the plan was to kill her while they were driving, and she was the person driving to facilitate that. Never once has she admitted that, never once has she faced up to that, or never once has she accepted that. And we feel that's an extremely important point that's been just completely overlooked in terms of her explosive nature or what she could be capable of doing if things just don't go quite her way or somebody stronger than her is involved with her once again in a relationship she says that she just froze and wanted to stop the crime, but that's not what she did. She kept right along continuing her role in the offense, which was to drive the vehicle to facilitate the murder. And yet she said during the time that—upon several questions it took before she would admit what she was thinking, and she said she was thinking she

had to stop them. *And we do not feel that this is any way true whatsoever.* She had no intention of stopping them. She may have been horrified by the violence, she may have been stunned by it, but allowed it simply to go on, doing nothing at all to prevent it, and in fact, participating later in a clean-up and in covering up the offense."

The panel hearing Shigemura's application denied her request for a parole date. The chair of the panel stated the panel did not believe she had come to grips with her role in the crime. In particular, the chair was bothered by the fact that although the written statement Shigemura had provided discussed her life before the crime and her work after the crime in some length, she provided very little information about what she felt when the crime was being committed. The chair stated: "[U]ntil you come to grips with this crime and actually deal with it in a more assertive way—your commentary were things like, I couldn't believe this was happening, was what you told one of the psychs, couldn't believe this was unfolding. Those are very generalized statements, and when you contrast that with the work that you've done on yourself to find out how you got there and then gloss over the crime, jump right over it to some other circumstance, that tells us that you have not worked on the crime itself. You don't have to tell us, you're not going to have to tell any Panel, that you heard six or seven or ten blows, but we have to—there was a tremendous act of violence that was occurring in your very presence, and you don't even talk about it. You don't even mention it. It tells us that that is still probably pretty horrific in your own memory, and that you still have not dealt with it. Now, do I think you can? Certainly. I just don't think you have. I think you've masked it with determining, and the release that that is, determining how you got to where you were. That is a very freeing experience, but you've got to go beyond that. You have to actually deal with, not only for your purposes, for this Panel, for [the Holloway family members who appeared remotely by television], they need to understand that you have come to grips with this, and we just didn't hear it today." More particularly, the chair criticized Shigemura's description of her role in the crime: "There's no question we understand that you're responsible, but in your commentary . . . you describe your role there as almost a leadership role, that all you needed to do was say, stop this, and it would have stopped. I don't believe you were in a leadership role, so I don't know why you say that, unless it's playing to the Panel. You probably had no ability to do anything that day. You need to come to grips with that. And until you do, you're still a risk."

5.  *Habeas Corpus Proceedings*

As we have indicated, by way of a petition for a writ of habeas corpus Shigemura challenged the board's decision to deny her request for a release

date. The trial court granted the petition. The trial court stated: "In petitioner's case, the Board's findings that her statements lacked insight and that she did not truly understand her role in the crime or the nature of her actions are unsupported by the record and inconsistent with the weight of the evidence in the record. . . . Here, petitioner's insight was shown by the record and does not indicate current dangerousness."

As we noted at the outset, the warden of the prison where Shigemura is incarcerated filed a timely notice of appeal.[4]

## DISCUSSION

### I

■ The decision whether to grant parole is an inherently subjective determination (*In re Rosenkrantz* (2002) 29 Cal.4th 616, 655 [128 Cal.Rptr.2d 104, 59 P.3d 174] (*Rosenkrantz*)) that is guided by a number of factors identified in Penal Code[5] section 3041 and the board's regulations. (Cal. Code Regs., tit. 15, §§ 2281, 2402.) In making its suitability determination, the board must consider "[a]ll relevant, reliable information" (Cal. Code Regs., tit. 15, § 2402, subd. (b)), such as the nature of the commitment offense including behavior before and after the crime; the prisoner's social history and mental state; criminal record; attitude towards the crime; and parole plans (*ibid.*). The circumstances tending to show unsuitability for parole include the inmate (1) committed the offense in a particularly heinous, atrocious or cruel manner; (2) possesses a previous record of violence; (3) has an unstable social history; (4) has previously sexually assaulted another individual in a sadistic manner; (5) has a lengthy history of severe mental problems related to the offense; and (6) has engaged in serious misconduct while in prison. (Cal. Code Regs., tit. 15, § 2402, subd. (c).)

■ Judicial review of the board's decision is exceedingly deferential. Courts may not substitute their own judgment for the board's. We may not

---

[4] Shortly before we heard argument in this case, the warden asked that her appeal be dismissed. At argument we inquired of counsel for the warden what, if any, grounds supported the warden's request for dismissal. Counsel was unable to provide us with any information with respect to the warden's request. Because of the seriousness of the life crime, the importance of the board's role in protecting public safety and the extreme deference courts must accord board decisions, we deny the warden's request for dismissal. We note: "After the record on appeal is filed, dismissal of the action based on abandonment or stipulation of the parties is discretionary, rather than mandatory. [Citations]. 'We have inherent power to retain a matter, even though it has been settled and is technically moot, where the issues are important and of continuing interest.' [Citation.]" (*City of Morgan Hill v. Brown* (1999) 71 Cal.App.4th 1114, 1121, fn. 5 [84 Cal.Rptr.2d 361]; see Cal. Rules of Court, rule 8.244.)

[5] All further statutory references are to the Penal Code unless otherwise indicated.

reweigh the evidence, resolve conflicts in the evidence or consider whether the evidence establishing suitability for release outweighs evidence supporting denial of release. (See *Rosenkrantz, supra,* 29 Cal.4th at p. 677.) As tempting as it may be to reweigh the record, rebalance the board's evaluations, or adopt other plausible explanations for the life crime, judicial review of the board's decisions in a parole suitability case is specific and confined. (*Ibid.*) We may inquire only whether there is some evidence in the record before the board supporting its determination that an inmate is a current threat to public safety and therefore unsuitable for release. (*In re Lawrence* (2008) 44 Cal.4th 1181, 1228 [82 Cal.Rptr.3d 169, 190 P.3d 535] (*Lawrence*); *Rosenkrantz, supra,* 29 Cal.4th at p. 677.) "Some evidence" means " 'a modicum of evidence.' " (*Rosenkrantz, supra,* 29 Cal.4th at pp. 664–665.)

Importantly, although we are required to give deference to the decisions of the board, we must also give those decisions a meaningful level of review which goes beyond simply deciding whether a single unsuitability factor exists. "[I]n light of the constitutional liberty interest at stake, judicial review must be sufficiently robust to reveal and remedy any evident deprivation of constitutional rights. If simply pointing to the existence of an unsuitability factor and then acknowledging the existence of suitability factors were sufficient to establish that a parole decision was not arbitrary, and that it was supported by 'some evidence,' a reviewing court would be forced to affirm any denial-of-parole decision linked to the mere existence of certain facts in the record, even if those facts have no bearing on the paramount statutory inquiry. Such a standard, because it would leave potentially arbitrary decisions of the Board or the Governor intact, would be incompatible with our recognition that an inmate's right to due process 'cannot exist in any practical sense without a remedy against its abrogation.' [Citations.]

■ "[U]nder the statute and the governing regulations, the circumstances of the commitment offense (or any of the other factors related to unsuitability) establish unsuitability if, and only if, those circumstances are probative of the determination that a prisoner remains a danger to the public. It is not the existence or nonexistence of suitability or unsuitability factors that forms the crux of the parole decision; *the significant circumstance is how those factors interrelate to support a conclusion of current dangerousness to the public.*" (*Lawrence, supra,* 44 Cal.4th at pp. 1211–1212, italics added.) While the standard of review here is deferential, as one court aptly stated, it "does not convert a court reviewing the denial of parole into a potted plant." (*In re Scott* (2004) 119 Cal.App.4th 871, 898 [15 Cal.Rptr.3d 32].)

Of pertinence here, "[w]hile we generally defer to the decision of the trial court on issues of fact and subjective judgment, in a parole case such as this, the trial court review and our review are based on the administrative record

(and appropriate briefing based on that record), and we exercise our independent review of the trial court's decision. (See *Rosenkrantz, supra,* 29 Cal.4th at p. 667; *In re Van Houten* (2004) 116 Cal.App.4th 339, 349 [10 Cal.Rptr.3d 406].) Our deference is thus to the decision of the executive branch expressed by the Board or the Governor, not to the trial court." (*In re Davidson* (2012) 207 Cal.App.4th 1215, 1222 [144 Cal.Rptr.3d 283].)

## II

In considering whether there is evidence Shigemura is a current threat to public safety, we are governed largely by the holdings in *In re Shaputis* (2008) 44 Cal.4th 1241 [82 Cal.Rptr.3d 213, 190 P.3d 573] (*Shaputis I*) and *In re Shaputis* (2011) 53 Cal.4th 192 [134 Cal.Rptr.3d 86, 265 P.3d 253] (*Shaputis II*).

### 1. *Shaputis I*

In *Shaputis I, supra,* 44 Cal.4th 1241 the court found evidence supporting the Governor's reversal of an order granting a prisoner parole. The prisoner in *Shaputis I* had a long history of alcoholism, domestic abuse and minor criminality. During a fight with his second wife, he shot and killed her and was convicted of second degree murder. Although, while incarcerated the prisoner remained discipline free, he continued to receive negative psychological evaluations and continued to maintain his wife's death had been the result of an "accident." In reversing the Board's grant of parole, the Governor relied on the aggravated nature of the crime and his lack of insight into the murder and the years of domestic violence which had preceded it.

The Supreme Court upheld the Governor's determination. The court found that, because of the prisoner's long history of violence toward his wife and children, the circumstances of the commitment offense were relevant in determining the prisoner's current risk to public safety. Significantly, the court also relied on the prisoner's lack of insight into his history of violence and the crime itself: "The record establishes, moreover, that although petitioner has stated that his conduct was 'wrong,' and he feels some remorse for the crime, he has failed to gain insight or understanding into either his violent conduct or his commission of the commitment offense. Evidence concerning the nature of the weapon, the location of ammunition found at the crime scene, and petitioner's statement that he had a 'little fight' with his wife support the view that he killed his wife intentionally, but as the record also demonstrates, petitioner *still* claims the shooting was an *accident*. This claim, considered with evidence of petitioner's history of domestic abuse and recent psychological reports reflecting that his character remains unchanged and that he is unable to gain insight into his antisocial behavior despite years of

therapy and rehabilitative 'programming,' all provide some evidence in support of the Governor's conclusion that petitioner remains dangerous and is unsuitable for parole." (*Shaputis I, supra,* 44 Cal.4th at p. 1260, fns. omitted.)

With respect to a prisoner's insight and remorse, the court added the following by way of footnote: "We note that expressions of insight and remorse will vary from prisoner to prisoner and that there is no special formula for a prisoner to articulate in order to communicate that he or she has gained insight into, and formed a commitment to ending, a previous pattern of violent behavior. In this case, however, the Governor's reliance on petitioner's lack of insight is amply supported by the record—both in petitioner's own statements at his parole hearing characterizing the commitment offense as an accident and minimizing his responsibility for the years of violence he inflicted on his family, and in recent psychological evaluations noting petitioner's reduced ability to achieve self-awareness." (*Shaputis I, supra,* 44 Cal.4th at p. 1260, fn. 18.)

### 2. *Shaputis II*

■ Following the court's decision in *Shaputis I*, the prisoner again applied for a release date. Relying on the report of a psychologist he had retained, the prisoner again argued that he no longer posed a threat to public safety. The board denied his application, again finding he lacked insight and failed to take responsibility for his actions. In upholding the board's second order denying the prisoner's parole date, the Supreme Court reaffirmed the limited scope of judicial review and the deferential nature of the "some evidence" standard for reviewing parole suitability determinations. (*Shaputis II, supra,* 53 Cal.4th at p. 211.) The court stated: "While the evidence supporting a parole unsuitability finding must be probative of the inmate's current dangerousness, it is not for the reviewing court to decide *which* evidence in the record is convincing. [Citation.] Only when the evidence reflecting the inmate's present risk to public safety leads to but one conclusion may a court overturn a contrary decision by the Board or the Governor. In that circumstance the denial of parole is arbitrary and capricious, and amounts to a denial of due process." (*Ibid.*)

"[A] court must consider the whole record in the light most favorable to the determination before it, to determine whether it discloses some evidence—a modicum of evidence—supporting the determination that the inmate would pose a danger to the public if released on parole. [Citations.] The court may not, as the Court of Appeal majority did here, substitute its own credibility determination for that of the parole authority. [Citations.] Any relevant evidence that supports the parole authority's determination is sufficient to satisfy the 'some evidence' standard. [Citation.]" (*Shaputis II, supra,* 53 Cal.4th at p. 214, fn. omitted.)

In specifically discussing the relative importance of an inmate's insight into the life crime, the court stated: "Consideration of an inmate's degree of insight is well within the scope of the parole regulations. The regulations do not use the term 'insight,' but they direct the Board to consider the inmate's 'past and present attitude toward the crime' [citation] and 'the presence of remorse,' expressly including indications that the inmate 'understands the nature and magnitude of the offense' [citation]. These factors fit comfortably within the descriptive category of 'insight.' " (*Shaputis II, supra,* 53 Cal.4th at p. 218.) "[*T*]*he presence or absence of insight is a significant factor in determining whether there is a 'rational nexus' between the inmate's dangerous past behavior and the threat the inmate currently poses to public safety.* [Citations.]" (*Ibid.,* italics added.)

### 3. *Analysis*

First, we note the trial court here found the board's determination that Shigemura lacks insight is against "the *weight* of the evidence." This statement reflects an erroneous view of the trial court's role in reviewing a board or gubernatorial decision. Resolution of any conflicts in the evidence and the weight to be given the evidence are matters within the authority of the board and Governor. (*Rosenkrantz, supra,* 29 Cal.4th at p. 677.) Our role and the trial court's role are limited: we may only determine whether there is some evidence which supports the board's decision. (*Ibid.*)

Here, there *is* evidence to support the board's determination Shigemura lacks insight into important aspects of how, from an emotional perspective, she participated in the murder of Holloway. That evidence begins with the plan to kill Mynett. Our review of her very matter-of-fact statements about Mynett leaves the distinct impression that even at the time of the parole hearing she seemed to accept that the plan to kill Mynett, while unfortunate in that it led to Holloway's death, was not itself morally reprehensible. In her interview with the psychologist who conducted her most recent evaluation, she stated: "It started with Douglas Mynett. He was a friend of Brian's and he used a lot of drugs and sold drugs to Hell's Angels. He was a bad guy. He had kidnapped and harassed Robert [Jurado], because Robert owed him some money. I got to know him a little while staying at Brian's on my weekend passes." After describing Mynett's theft of her purse and the telephone call she received from Mynett's friends, Shigemura stated: "So Brian called from jail and I told him everything. Brian then called Robert to come get me. Robert picked me up and we went to our friend, Schmidt's house. Robert was also panicking now, because he owed Douglas some money. Robert was thinking too that maybe Douglas would tell those people that we have his money. [Holloway] . . . was at Schmidt's house and she started asking a lot of questions about what was going on, but we didn't tell her anything. Robert started asking Schmidt if there was a gun in the house."

These recent statements are consistent with her 2006 account of her interaction with Jurado and Mynett following her release from MCC custody: "Jurado had gotten himself into a lot of trouble while I was gone and it led him [to] being kidnapped and me being pulled back into his mess. Being confused and not wanting him to get hurt I tried to help him, and because of all of this Douglas [Mynett] started becoming a threat and aggressive to all of us. [¶] We were all afraid of [Mynett] and clung to each other." These accounts plainly support the conclusion that to a significant degree Shigemura still accepts, rather than questions, the overwhelming imperative to kill Mynett which she and Jurado felt at that time of the life crime.

Closely related to her continuing unquestioning views about the plan to kill Mynett are statements Shigemura made in which she seemed to blame Holloway, in part, for her own death. In her most recent statement to the psychologist, Shigemura referred to the fact Holloway "started asking a lot of questions" and that later Johnsen "told her everything." In her earlier 2006 account, Shigemura stated: "I was afraid to just leave because I didn't know what Jurado would do. [¶] I didn't believe it would all catapult to the extreme it did. I felt like if I could just get back to Work Furlough it would be my escape. *When Theresa Holloway got involved by asking too many questions it just got worse.*" (Italics added.)

Finally, we note Shigemura's descriptions of what was going through her mind while Holloway was being choked in the seat next to her and later bludgeoned to death in the ditch. In the account she provided her psychologist, she stated: "It felt unreal. My head kept telling me, 'You can do this, do that,' but all I did was drive. I was driving really badly, too—I stripped all the gears in the car and it broke down. Robert jumped out. Theresa was in the backseat, on the ground. I told Anna, 'Just go' and she took off. [¶] Everything felt unreal. Robert dumped Theresa in the ditch and I heard him hit her a few times. I couldn't believe what was happening. I kept thinking, 'This is crazy'. It's happening right there on the road where people are passing."

Later, when the chair of the panel followed up on this description of what she was thinking, Shigemura stated: "I was so afraid that when it first started I actually turned a light on in the car, and I was like paralyzed. I couldn't think. I couldn't drive. I didn't know what to think. I was stuck. I should have [done] anything. I should have just stopped the car." When pressed further by the chair, Shigemura responded: "I was thinking that I have to stop

and help Theresa." The chair then asked her what she did, and Shigemura said: "I didn't. I didn't do anything."

Considered together, Shigemura's benign view of the plan to kill Mynett, her continuing feeling Holloway "asked too many questions" and her description of her emotional paralysis at the time Holloway was being killed in her presence suggests that even 21 years after the life crime, Shigemura is still engaged in a great deal of rationalization of and detachment from her role in Holloway's death. Shigemura's agreement with the plan to kill Mynett, her role as driver of the car with Jurado sitting behind Holloway, her active participation in moving, retrieving and cleaning the car, and then creating an alibi for her missed curfew are totally at odds with her continuing portrayal of the crime as something which simply happened in her presence and without her active assistance. These aspects of the record provide ample evidence Shigemura lacks insight into the life crime and her role in it.

In this regard, the panel chair's criticism of Shigemura's belief that if she had only just intervened she could have stopped Holloway's murder was fully warranted. Contrary to Shigemura's repeated assertions, she was not a detached observer who would have been willing or able to intervene and prevent the murder. Rather, the record shows Shigemura was a very willing participant in helping Jurado and, sadly, had no meaningful desire or ability to prevent Holloway's death.

We recognize there are statements in the record in which Shigemura expresses remorse and regret for her role in the life crime, an understanding that her profound feelings of worthlessness contributed to her decision to renew a relationship with Jurado following her release from federal custody, as well as acknowledgement that the events leading to Holloway's death were spinning out of control. A trier of fact could reasonably find these statements and the psychologist's positive appraisal outweigh the deficiencies we have identified and demonstrate Shigemura has sufficient insight into the life crime. However, as we have indicated, we are not empowered to resolve or reweigh such an evidentiary conflict. Rather, we are limited to determining whether there is some evidence in the record to support the board's determination Shigemura lacks insight into the life crime. We have found such evidence of her lack of insight.

As in *Shaputis II*, Shigemura's lack of insight into the life crime is a significant factor in determining whether she is a current threat to public safety and sufficient to support the board's ultimate decision denying her application for a parole date. Thus, the trial court erred in granting Shigemura's petition.

## DISPOSITION

The order granting the petition for a writ of habeas corpus is reversed and the trial court is directed to enter a new order denying the petition.

Huffman, J., and Nares, J., concurred.