Filed: 7/23/14

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| In re J.F., a Person Coming Under the Juvenile Court Law. | B252864 (Los Angeles County Super. Ct. No. CK87457) |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES, Plaintiff and Respondent, v. N.D., Defendant and Appellant. | |

APPEAL from an order of the Superior Court of the County of Los Angeles, Jacqueline Lewis, Commissioner. Affirmed.

Marissa Coffey, under appointment by the Court of Appeal, for Defendant and Appellant N.D.

Roni Keller, under appointment by the Court of Appeal, for Respondent J.F.

No appearance by Plaintiff and Respondent Los Angeles County Department of Children and Family Services.

**INTRODUCTION**

Defendant and appellant N.D. (mother) was a minor when the Department of Children and Family Services (the Department) filed a petition under section 300 of the Welfare and Institutions Code[1] on behalf of her 17-month-old son J.F. The juvenile court found jurisdiction because of mother's mental condition, declared J.F. to be a dependent, and ordered him to remain in the home of mother. The juvenile court has continued to maintain jurisdiction over J.F. Mother appeals from an order entered at the last contested section 364 hearing at which the juvenile court maintained jurisdiction despite the recommendation of the Department to terminate jurisdiction. We interpret section 364, subdivision (c) to permit the juvenile court to retain jurisdiction if there is sufficient evidence to support such retention, notwithstanding the recommendation of the Department to terminate jurisdiction. We affirm the order.

**BACKGROUND**

In early March 2011, mother, a 16-year-old dependent of the court, reportedly wanted to hurt herself and others. There was information she had been subjected to sexual abuse as a child by her stepfather and, as a result, had homicidal ideations. She acknowledged a history of using marijuana. She was then hospitalized. J.F.'s paternal grandmother[2] was caring for him during mother's hospitalization. J.F. was healthy and showed no signs of abuse or neglect.

Upon release from the hospital, mother lived with paternal grandmother and J.F., and, according to a children's social worker, J.F. was doing well in mother's care. A Department report reflected that mother met her therapy and medication requirements.

---

[1]     All further statutory references are to the Welfare and Institutions Code.

[2]     Sometimes confusingly referred to in the record as "paternal great grandmother," "maternal grandmother," and "maternal great grandmother."

2

According to a psychiatrist with the Department of Mental Health, mother was involved in J.F.'s life, had a positive outlook, and wanted to return to school to complete her education. J.F.'s father did not live with mother and J.F. In March and April of 2011, father's whereabouts were unknown. He was incarcerated in May of 2011. Later, it was reported he had no place of residence. He was accorded monitored visits with J.F. On April 22, 2011, the Department filed a so-called "not detained" petition on behalf of 17-month-old J.F. pursuant to section 300, subdivisions (b) and (g). Father was found to be J.F.'s presumed father. Over J.F.'s counsel's objection, the juvenile court did not detain J.F. from mother's custody. Mother's contact with J.F. was, however, monitored. J.F. was not to be left alone with mother and was to sleep at the residence of "maternal great grandmother."

On May 25, 2011, at a jurisdictional hearing, the juvenile court sustained an amended count b-1, finding true that mother had mental and emotional problems, including depression, auditory hallucinations, and suicidal and homicidal ideations in the past. She was psychiatrically hospitalized in March 2011. Allegations pertaining to father were not acted upon. Counsel for J.F. filed a section 388 petition on May 25, 2011, seeking an order detaining J.F. from mother's care. In response to the section 388 petition, the Department reported it was in J.F.'s best interest to remain in mother's custody. Mother and J.F. were moved to the foster home of L.M.

L.M. reported positively on mother's treatment of J.F., and mother continued to comply with her therapy and medication requirements. On one occasion, it was noted that mother was not taking all her pills, believing she did not need them, but was then advised to keep taking them.

On July 6, 2011, the juvenile court dismissed counts b-1 and g-1 as to father. The juvenile court made dispositional findings declaring J.F. a dependent and ordering that he remain "home-of-parent mother." Mother was ordered to participate in parenting teen services, participate in counseling to address her history of being sexually abused, and take three random drug tests. The juvenile court denied J.F.'s section 388 petition,

3

finding the requested change of order concerning the role of "maternal great grandmother" not to be in J.F.'s best interests.

On February 1, 2012, the juvenile court conducted a hearing pursuant to section 364 and found that the conditions justifying the initial assumption of jurisdiction were likely to exist if supervision was withdrawn. On August 1, 2012, at a section 364 hearing, J.F.'s counsel urged the juvenile court to maintain supervision for another six months, notwithstanding the Department recommendation to terminate jurisdiction. The juvenile court continued jurisdiction.

During 2012, mother continued to participate in counseling and parenting classes and she tested negative for drugs. A therapist wrote that mother "has made minimal progress in treatment due to difficulty remembering information about therapeutic interventions and parenting skills. I have difficulty recognizing if [mother] has difficulty comprehending interventions due to cognitive delay, or if her difficulties are related to her extensive trauma history."

Also during 2012, mother and J.F. were placed in Mary's Shelter, apparently because of paternal grandmother's lack of cooperation with the Department. On April 23, 2012, mother turned 18 years old "but remain[ed] under the supervision of [the Department] and Children's court and in out of home care under her mother's Dependency case." Mother was issued a "Learning Experience" referral from her group home for leaving J.F. unattended in a bathtub while she retrieved a bath-related item. Under supervision, no such further incidents occurred.

In August 2012, the Department recommended that the juvenile court terminate jurisdiction as no safety concerns were identified and mother "ha[d] made improvement with all her parenting goals." Mother was to undergo surgery for a cleft palate, continue to work towards a high school diploma, and continue to participate in individual counseling. Mother no longer experienced thoughts of trauma, continued to meet with her parenting instructor, improved on meeting parenting goals (although they were referred to as "a work in progress"), and her therapy sessions were going well.

4

In December 2012, the juvenile court terminated paternal grandmother's reunification services and ordered mother into a planned permanent living arrangement. The January 30, 2013, Department report reflected that mother remained a dependent of the court. Mother continued to do well medically, educationally, and in supervising J.F. The Department recommended that jurisdiction be terminated as there were no immediate safety concerns.

A March 13, 2013, Department report reflected that mother read to J.F. and praised him, but she talked to others when she needed to attend to J.F., and she cursed in front of J.F. There were other issues reported as to mother's parenting.

In February 2013, a peer reported that in November 2012, she witnessed mother kick J.F. and, at some time, hit J.F. in the head with a remote control device. A social worker found the allegations inconclusive. Mother vigorously denied the allegations. At a March 2013, section 364 hearing set by J.F.'s counsel after the Department's recommendation to terminate jurisdiction, counsel for J.F. again requested the juvenile court not to terminate jurisdiction, and the juvenile court retained jurisdiction.

On August 3, 2013, the Department again recommended a termination of juvenile court jurisdiction with mother having sole custody of J.F. On September 18, 2013, the Department reported that mother was still in Mary's Shelter; she underwent outpatient surgery; she would graduate from high school in June of 2014; she continued to participate in parenting classes; her communication with J.F. had improved slightly, although she sometimes spoke harshly to J.F.; she "continued to struggle with her supervision of J.F."; she had difficulty in providing meals for J.F.; and she lacked consistency in dealing with J.F.'s sleep, nap times, and toilet training. A counselor reported that mother had been consistent with her treatment; had made substantial progress; and would benefit from continued treatment. It was also reported that there was no significant reason to prescribe any medications for mother at that time. The Department counselor concluded "that the risk level in regard to this case is Moderate. . . . [Mother] will remain under [the Department] and Dependency Court

5

supervision as a non minor dependency via AB 12 [which provides for those eligible to remain in foster care after turning 18 years old]. (§ 303, subds. (a), (b).)"

On November 12, 2013, at the section 364 hearing set by J.F.'s counsel after the Department recommended a termination of jurisdiction, J.F.'s counsel again requested the juvenile court not to terminate jurisdiction. The juvenile court continued jurisdiction. The juvenile court found that while mother's past mental health issues were no longer a continued risk to J.F., she continued to "struggle a bit" with providing J.F. everything he needed. The juvenile court explained: "The reality is this: As I sit here, day in and day out, more and more and more cases that seem to return to these systems are from young people who have babies that were once in the system themselves. And what happens when that comes in is that those children are removed. [¶] And the court is seriously concerned that, without the protections in place, that that could happen to [mother]. And I would not want to see [J.F.] removed from her. And I do believe that court jurisdiction is necessary to keep those services in place, to keep [J.F.] with [mother], and to keep him appropriately supervised and protected. . . . I believe that terminating jurisdiction at this time is, No. 1, risky for [J.F.]; and, No. 2, I think it's risky for [mother] because I think, without the proper supervision and services in place, [mother] could lose [J.F.] and that is risky for her as well." The juvenile court concluded, "So in trying to balance everyone's needs and what will keep [J.F.] safe and [mother] with her son, which is what I know she wants, the Court is maintaining jurisdiction."

Mother filed a timely notice of appeal on November 12, 2013. J.F.'s attorney filed a response. The Department filed a letter saying that it had recommended jurisdiction be terminated and was "aligned with appellant below." It said it would not file a brief and that the appropriate respondent is J.F.[3]

---

[3]    Mother requested we judicially notice a minute order indicating that on July 14, 2014, the juvenile court terminated jurisdiction. J.F. opposed taking judicial notice that jurisdiction had been terminated and noted that any such order was not final and would be appealed. Mother also filed an abandonment of appeal and requested that we dismiss the appeal. We have discretion whether to dismiss the appeal (Cal. Rules of Court, rule 8.411(b)(2); *In re Marriage of Barneson* (1999) 69 Cal.App.4th 583, 585, fn. 1.)

## DISCUSSION

### A.     Standard of Review

Orders made pursuant to section 364 are reviewed for substantial evidence.  (*In re N.S.* (2002) 97 Cal.App.4th 167, 172; *In re Baby Boy L.* (1994) 24 Cal.App.4th 596, 610.) Under the substantial evidence standard of review, the appellate court does not reweigh the evidence, evaluate the credibility of witnesses, or draw inferences contrary to the findings of the trial court.  (*In re Michael G.* (2012) 203 Cal.App.4th 580, 589.)  The appellate court "accept[s] the evidence most favorable to the order as true and discard[s] the unfavorable evidence as not having sufficient verity to be accepted by the trier of fact." (*In re Casey D.* (1999) 70 Cal.App.4th 38, 52-53.)  For evidence to be sufficient to support a trial court's finding, it must be reasonable, credible, and of solid value.  (*In re B.T.* (2011) 193 Cal.App.4th 685, 691.)

### B.     Applicable Law

Under section 364, subdivision (c), the juvenile court shall determine whether continued supervision is necessary when a child not removed from the parent is receiving family maintenance services.  The second sentence of section 364, subdivision (c) provides as follows:  "The court shall terminate its jurisdiction unless the social worker or his or her department establishes by a preponderance of evidence that the conditions still exist which would justify initial assumption of jurisdiction under Section 300, or that those conditions are likely to exist if supervision is withdrawn."  Under section 364, the juvenile court must determine whether "the conditions still exist which would justify initial assumption of jurisdiction under section 300, or those conditions are likely to exist if supervision is withdrawn."  The language of section 364 does not literally require that

---

We grant mother's request for judicial notice but, not withstanding possible mootness and the request for dismissal, we exercise our discretion and decline to dismiss the appeal as the issue involved is of sufficient importance and of continuing interest.  (*In re William M.* (1970) 3 Cal.3d 16, 23; *In re Shigemura* (2012) 210 Cal.App.4th 440, 451, fn. 4.)

the precise conditions for assuming jurisdiction under section 300 in the first place must still exist—rather that conditions exist that "*would* justify initial assumption of jurisdiction." (Italics added.) (But see *In re Janee W.* (2006) 140 Cal.App.4th 1444, 1451.)

Mother contends that because the Department recommended termination of jurisdiction, it did not establish "by a preponderance of evidence that the conditions still exist which would justify initial assumption of jurisdiction under section 300, or that those conditions are likely to exist if supervision is withdrawn" and therefore the juvenile court "should terminate its jurisdiction." (§ 364, subd. (c).) Mother argues it is the Department that must establish the facts for continued jurisdiction and if it fails to do so, the juvenile court is required to terminate jurisdiction.[4] Mother also points to the Department's recommendations that jurisdiction be terminated and argues that "the juvenile court was compelled to terminate jurisdiction."

We read section 364, subdivision (c) to mean that the juvenile court may retain jurisdiction notwithstanding the recommendation of, or facts solely submitted by, the Department if there is a preponderance of evidence that the conditions are such to justify that retention. The first sentence of section 364, subdivision (c) provides, "After hearing any evidence presented by the social worker, the parent, the guardian, or the child, the court shall determine whether continued supervision is necessary." This sentence would be rendered nugatory if the Department could, in effect, determine by itself that jurisdiction must be terminated. As reflected in the first sentence, after considering all the evidence, it is the juvenile court that is to determine whether continued supervision is necessary.

The Supreme Court in *People v. Shabazz* (2006) 38 Cal.4th 55 at pages 67 through 68, set forth the rules of statutory interpretation that are relevant here: "To resolve this

---

[4]    In her brief, mother states, "the California Legislature found that the juvenile court *shall* terminate its jurisdiction '*unless*' [the Department] establishes by a preponderance of evidence that conditions still exist which would justify initial assumption of jurisdiction under section 300 or that these conditions are likely to exist if supervision is withdrawn."

8

ambiguity, we rely upon well-settled rules. 'The meaning of a statute may not be determined from a single word or sentence; the words must be construed in context, and provisions relating to the same subject matter must be harmonized to the extent possible. [Citation.] Literal construction should not prevail if it is contrary to the legislative intent apparent in the statute. . . . An interpretation that renders related provisions nugatory must be avoided [citation]; each sentence must be read not in isolation but in light of the statutory scheme [citation]; and if a statute is amenable to two alternative interpretations, the one that leads to the more reasonable result will be followed [citation].' [Citation]; see also *Robert L.* [*v. Superior Court* (2003)] 30 Cal.4th 894, 903 ["'Statutory language should not be interpreted in isolation, but must be construed in the context of the entire statute of which it is a part, in order to achieve harmony among the parts'"].)"

To give veto power to the Department would unreasonably divest the juvenile court of the power to determine what is best for the child. The intention of the Legislature is best derived from the first sentence of section 364, subdivision (c) and the other dependency provisions that give the juvenile court the responsibility for determining matters related to the interests of the child. (See, e.g., §§ 300; 362, subds. (a) & (c); 366; 366.21; 366.22, subd. (a); 366.26; 366.3.) "Although the meaning of a statutory phrase may be plain and certain if the phrase is considered in isolation, blind adherence to the text of a statutory phrase is improper if its literal interpretation is inconsistent with other provisions of the same statute, defeats the apparent legislative intent and is otherwise in conflict with accepted interpretive canons." (*Hatch v. Superior Court* (2000) 80 Cal.App.4th 170, 226.) Moreover, interpretation of statutory language leading to absurd results is to be avoided. (*People v. Loeun* (1997) 17 Cal.4th 1, 9.)

To interpret the second sentence of section 364, subdivision (c) to mean that a juvenile court, after hearing the evidence, cannot retain jurisdiction over a child just because the Department recommends that jurisdiction be terminated is inconsistent with the first sentence of the provision and with the apparent legislative intent and would lead to an absurd result. The Department, in a letter brief in response to a question from this court, agrees that to read the statute to mean that the juvenile court must terminate

jurisdiction unless the Department establishes that jurisdiction must be retained renders the first sentence superfluous and that the juvenile court does not have to follow the recommendations of the Department. As the Department notes, the juvenile court has "an equitable duty to protect the welfare of children within its jurisdiction." (*In re I.G.* (2014) 226 Cal.App.4th 380, 386.)[5]

Also, it is arguable that giving the Department the power to determine judicial jurisdiction would be a violation of the state constitution's provision for the separation of powers. (Cal. Const., art. VI, § 1; *People v. Bunn* (2002) 27 Cal.4th 1, 15-16; *People v. Tenorio* (1970) 3 Cal.3d 89, 95; *In re S.H.* (2003) 111 Cal.App.4th 310, 317 ["power to decide whether any visitation occurs belongs to the court alone"]; *In re M.C.* (2011) 199 Cal.App.4th 784 [juvenile court's authority to direct the social worker to file a section 300 petition does not violate separation of powers]; *In re Moriah T.* (1994) 23 Cal.App.4th 1367, 1373-1377; *In re Danielle W.* (1989) 207 Cal.App.3d 1227, 1237.) As the Supreme Court recently said in *People v. Gutierrez* (2014) 58 Cal.4th 1354, 1373, "When a question of statutory interpretation implicates constitutional issues, we are guided by the precept that '"[i]f a statute is susceptible of two constructions, one of which will render it constitutional and the other unconstitutional in whole or in part, or raise serious and doubtful constitutional questions, the court will adopt the construction which, without doing violence to the reasonable meaning of the language used, will render it valid in its entirety, or free from doubt as to its constitutionality, even though the other construction is equally reasonable."' [Citations.]" Thus, the avoidance of the constitutional issue of separation of powers also supports our interpretation of section 364, subdivision (c). Accordingly, the juvenile court may retain jurisdiction if the evidence supports that retention, irrespective of the recommendation of the Department.

---

[5]      Mother has joined in the letter brief submitted by the Department.

10

### C. Application of Law

There is substantial evidence submitted by the Department and in the record that supports the juvenile court's determination not to terminate jurisdiction. J.F. resides with mother in a group home. His safety and well being are monitored or provided for by the staff when mother is at school or otherwise away. The Department reported that the goals for mother included appropriate interaction with J.F. and the recognition of "the importance of managing her frustrations" and keeping J.F. "within her view." On one occasion, instead of preparing J.F. for a needed doctor's appointment, mother chose to socialize with friends. It was reported, "Parenting comes second behind socializing for [mother] this quarter." It was also reported she cursed in front of J.F.

The Department reported that as to communication with her child, mother has "displayed slight improvement . . . [but sometimes] she speaks harshly toward [J.F.]"; mother "has continued to struggle with her supervision of [J.F.]"; and she relied on the staff to change and feed J.F. and to take him to the doctor or school. The counselor reported that mother "will benefit from continued treatment." The Department in its assessment said that mother's "parenting and mental health concerns that brought her to the attention of [the Department] and Children's court remain a work in progress." The caseworker "conducted an assessment and determined that the risk level in regard to this case is Moderate."

Further, mother was eligible for special education services "under the criteria of a specific learning disability and secondary disabilities such as speech and language impairment and emotional disturbances." There is no evidence concerning mother's capacity to live independently. This evidence is sufficient to support the juvenile court's retention of jurisdiction.

## DISPOSITION

The order is affirmed.

**CERTIFIED FOR PUBLICATION**


MOSK, Acting P. J.


I concur:


MINK, J.*

---

\* Retired Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

KRIEGLER, J., Dissenting

In re J.F.; DCFS v. N.D.

B252864

I respectfully dissent from my colleagues' determination to reach the merits of this appeal, as set forth in footnote 3 of the majority opinion. Both the Department of Children and Family Services (Department) and mother agree this case is moot— the dependency court has terminated jurisdiction. In recognition of this fact, mother has moved to voluntarily dismiss her appeal. I would grant that request and put this litigation to an end.

This case is particularly deserving of dismissal on mother's request. Mother raised only one issue on appeal: is there substantial evidence to support the dependency court's order continuing to exercise jurisdiction over J.F. under Welfare and Institutions Code section 364?[1] That issue has been resolved by the termination of jurisdiction. Nothing more need be said regarding the issue.

Moreover, my colleagues attribute an argument to mother that she has never asserted. According to the majority, mother argues that because the Department recommended that jurisdiction be terminated, it follows that the Department did not prove by a preponderance of the evidence that continued jurisdiction was proper. The majority also interprets mother's argument to be that section 364 provides the Department with the "veto power" to divest the court with the power to continue the dependency.

In fairness to counsel for mother, she has not made the arguments attributed to her. In the opening brief, mother noted that the substantial evidence standard of review applied. She reviewed her progress and compliance with the case plan during the dependency. Based upon the record, mother argued current circumstances would not

---

[1]    All statutory references are to the Welfare and Institutions Code.

justify an initial assumption of jurisdiction, and therefore substantial evidence did not support the order continuing jurisdiction. Mother's fact-based contention never suggested that section 364 compels the trial court to follow the recommendation of the Department, which in this case was to terminate jurisdiction.

In her reply brief, mother again reviewed the evidence and argued that "[the Department] established by a preponderance of evidence that conditions did not exist which would justify initial assumption, therefore, the juvenile court was compelled to terminate jurisdiction and erred in not doing so, requiring reversal." The reply brief makes no mention of an interpretation of section 364 which affords the Department a veto power. Mother merely argued that because of the factual showing made by the Department, the record lacks substantial evidence to support the court's order continuing jurisdiction.

Any lingering doubt as to the argument made by mother is conclusively eliminated by her answer to this court's request for briefing on the following question: "If the [Department] recommends termination of jurisdiction, is its consent required to terminate jurisdiction; or if the [Department] has submitted a preponderance of evidence showing that jurisdiction should be retained, may the juvenile court reject the recommendation of the [Department] to terminate jurisdiction; or if there is sufficient evidence in the record justifying retention of jurisdiction, may the juvenile court retain jurisdiction notwithstanding the recommendation of the [Department]?" Mother answered the court's questions by unequivocally stating that the juvenile court makes an independent determination whether to terminate jurisdiction, the court may do so over the objection of the Department, and due process and an independent judiciary "demand that the juvenile court exercise its its judicial power independent of mandate by the [Department]."

I would grant mother's request to dismiss her appeal.


KRIEGLER, J.

2