Filed 6/24/13  In re Lockett CA2/3

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| In re<br><br>    WILLIE RAY LOCKETT, JR.,<br><br>    on<br><br>    Habeas Corpus. | B242244<br><br>(Los Angeles County<br>Super. Ct. No. KA022221) |

PETITION for Writ of Habeas Corpus.  Patricia Schnegg, Judge.  Petition granted.

Susan L. Jordan, under appointment by the Court of Appeal, for Petitioner.

Kamala D. Harris, Attorney General, Jennifer A. Neill, Assistant Attorney General, Phillip Lindsay and Gregory J. Marcot, Deputy Attorneys General, for Respondent.

Inmate Willie Ray Lockett, Jr., petitions for a writ of habeas corpus after the Board of Parole Hearings (Board) found him unsuitable for parole for the fourth time. Lockett contends the Board's denial of parole was not supported by "some evidence." We grant Lockett's petition and remand for a new hearing before the Board.

FACTUAL BACKGROUND

1. *Commitment offense, sentence, and prior unsuitability findings.*

On April 16, 1994, Lockett, who had turned 20 four days earlier, carjacked Dalbir Singh[1] at gunpoint in a Covina parking lot. Singh's companion, Alejandro Barajas, was able to flee, but Lockett forced Singh into Singh's 1993 Toyota Camry and drove off with him. After driving for a few blocks Lockett robbed Singh of cash and other possessions, and forced him into the vehicle's trunk. Lockett then drove Singh to an area several blocks away and released him, physically unharmed. Lockett drove Singh's car to Richmond in Northern California. A few days later Lockett led police on a high-speed chase after he was spotted driving Singh's car. When he turned onto a dead-end street, he stopped and fled. Police searching the car found a .45-caliber semi-automatic gun inside.

Lockett pleaded guilty to kidnapping for robbery with personal use of a firearm (Pen. Code, §§ 209, subd. (b), 12022.5, subd. (a));[2] carjacking (§ 215, subd. (a)); and second degree robbery (§ 211). The trial court sentenced Lockett to life in prison with the possibility of parole, plus four years. The abstract of judgment stated, "Court recommends parole at first eligible date." Lockett was committed to the California Department of Corrections on April 5, 1995. His minimum parole eligibility date was October 16, 2004.

The Board found Lockett unsuitable for parole at hearings conducted in 2003, 2006, and 2009. His most recent hearing transpired on January 13, 2011. The Board again denied parole, for the minimum period of three years, but recommended Lockett

---

[1]     In the record, the victim's first name is variously spelled Dalbir, Dabir, and Dalveer. It is unclear which spelling is correct.

[2]     All further undesignated statutory references are to the Penal Code.

move to advance his next hearing pursuant to section 3041.5, subdivision (d)(1). At the time of the 2011 parole suitability hearing, he had served approximately 16 years and was 36 years old.

Lockett petitioned for a writ of habeas corpus in the superior court, which was denied on February 14, 2012. On June 29, 2012, Lockett filed the instant habeas petition in this court. We issued an order to show cause.

2. *Social and prior criminal history.*

According to a psychologist's report, Lockett's parents separated when he was four years old. He has five younger half-siblings, two born to his father and three to his mother; all but one were born after he was incarcerated. He lived with both parents at times when he was a child. He reported that his mother was an alcoholic and was "drunk all the time at home," causing him to miss school while he cared for a younger sibling. At the age of eight, he was hospitalized for 11 months for a spinal disease, and was forced to lie on his stomach without moving for much of the time.

He was beaten up when he was 11 years old by a group of "friends" because he unknowingly used incorrect gang lingo. He reported taking a gun and shooting at the assailants, but apparently missed. As a result of the beating, he became more aggressive, got into fights at school, and was suspended twice as a result. He was expelled once for participating in extortion. He was sent to live with his father in Oakland, but returned to his mother's custody in Los Angeles when he was 13. He joined the P.J. Watts Crips, a local gang. He left school after completing the 10th grade. Between the ages of 12 and 16, he had at least 10 contacts with police that did not result in sustained petitions. Five involved joyriding or grand theft auto; one involved extortion; and one involved assault with a firearm. In April 1988 he suffered a sustained petition for assault with a deadly weapon other than a firearm and attempted robbery, after he fought with three minors who attacked him. In September 1988 he suffered another sustained petition for grand theft person after he took a skateboard from another minor, and threatened to shoot the victim when the victim tried to retrieve it. He was placed with the California Youth Authority (CYA) when he was 16, after he violated probation by refusing to follow a

teacher's instructions, used profanity in class, challenged another minor to a fight, and made gang signs. After his release from CYA, Lockett attended community college for one and one-half years, where he was on the football and swim teams. He was employed in various jobs for approximately two years. He was on CYA parole when he committed the commitment offenses.

Lockett used marijuana several times a week starting at age 15. According to a 2003 Psychological Evaluation, he sold cocaine on the street to support his drug habit. He stopped drug use when he was placed in CYA. After his release, at the age of 19, he increased his marijuana use to once or twice a week, sometimes lacing the marijuana with cocaine. He reportedly stopped using marijuana a month before the commitment offense, because he had a bad experience with a batch that, unbeknownst to him, had been laced with PCP. He did not drink alcohol until he was 18, and quickly stopped, given his mother's issues with alcohol abuse.

In 2010, Lockett told a prison psychologist he was on good terms, and in contact with, his parents and half-siblings.

3. *Prison disciplinary history.*

While in prison, Lockett was convicted twice of being in possession of a weapon (§ 4502), once in 1997 and once in 2003 for an incident that occurred in January 2002. As a result, he received two additional three-year determinate sentences. Including these incidents, Lockett has received 12 CDC 115 serious rules violations,[3] including nine "violence-related" violations.[4] He has also suffered three administrative rules violations

---

[3] A "CDC 115" refers to a rules violation report that documents misconduct that is believed to be a violation of law or is not minor in nature. (*In re Roderick* (2007) 154 Cal.App.4th 242, 249, fn. 3; Cal. Code Regs., tit. 15, § 3312, subd. (a)(3).)

[4] Lockett states in his petition that in addition to the two violations for weapons possession he suffered four violations for mutual combat; two for battery on an inmate; one for battery on a correctional officer; and one for possession of dangerous contraband. The 2011 hearing transcript at one point indicates a weapon possession in 2009, but this appears to be a typographical error.

4

for refusing a direct order, and has been counseled four times for minor misconduct. Lockett has been discipline-free since 2002.

4. *Accomplishments while in prison.*

After early 2002, Lockett became a model, or at least much improved, prisoner. He obtained his GED in 2008 and completed various community college classes. His Test of Adult Basic Education (TABE) score increased from the 8th grade level when he entered prison, to the 12th grade, nine-month level by 2007. He earned certifications in small business management from the Professional Career Development Institute, and "Serve Safe" from the National Restaurant Education Association. He completed various community college classes, including two English courses, Counseling, Early Childhood Education, and Mathematics. In 2010 he was enrolled in four additional classes. Lockett ended his gang affiliation in approximately 2003. He sought permission to have a gang tattoo on his neck removed, without success. He became a Muslim in 2003 and served as the Imam of a prison religious group. He attended Alcoholics Anonymous (AA) in 2006 and, at the time of the hearing, attended as a "support member." He participated in Narcotics Anonymous (NA) from 2006 through 2009, and was the program chairman at one point. Since 2005 he has worked as a cook, on the yard crew, in the paint shop, and as a barber, and has consistently received average to exceptional ratings. He has participated in a variety of self-help programs including Overcoming Addiction, Stress Management, Search Yourself, Anger Management, Successful Parenting Skills, Understanding and Handling Addiction, Core Emotions Training, Conditions of Life, and Handling Suppression, among others. In his spare time, he studies Yoga and Tai Chi, and draws.

5. *Psychological reports.*

In 2003, Lockett was diagnosed with depressive disorder, polysubstance dependence in sustained full remission in a controlled environment, and antisocial personality disorder. His risk of violent recidivism was estimated to be above average.

In 2007, he was diagnosed with "antisocial personality disorder, resolving." The psychologist opined that Lockett's conversion to Islam in 2003 had reduced his potential for violence.

A 2010 psychological evaluation concluded that overall, Lockett presented in the "[m]oderate range for violence in the free community." (Italics omitted.) The psychologist used three standard assessment tools: the Psychopathy Check List-Revised (PCL-R), the Historical-Clinical-Risk Management-20 (HCR-20), and the Level of Service/Case Management Inventory (LS/CMI). Lockett scored in the moderate range for psychopathy on the PCL-R; the moderate range for violent recidivism on the HCR-20; and the medium range for overall recidivism on the LS/CMI. All three assessment tools relied heavily on historical factors. At the interview for the 2010 psychological valuation, Lockett appeared "prosocial," friendly, nonaggressive, and thoughtful. The psychologist opined that Lockett "has made the transition from procriminal to prosocial attitudes and behaviors." Lockett met the criteria of having had a conduct disorder based on his history of criminality and aggression as an adolescent.

As of 2010, Lockett showed no evidence of any major mental illness. He demonstrated insight into the issues related to the life offense, to his previous use of substances, and in regard to his parole and relapse prevention planning. He did not have negative attitudes and had adopted a prosocial orientation. He had no current symptoms of a severe mental disorder, emotional or behavior volatility, or impulsivity. He had demonstrated response to treatment and was motivated toward self-improvement.

6. *Parole plans.*

Lockett presented considerable information demonstrating his parole plans, including offers of support, transitional living, and possible employment. His father, who owns a restaurant, and his stepmother offered their support, in terms of housing and a job. The psychologist opined in 2010 that Lockett's parole and relapse prevention plans were past the formative stage and moving toward "refining issues of concern." The psychologist opined that Lockett's "prognosis for parole at this time appears good," pending validation of his parole plans.

6

7. *Board's 2011 unsuitability finding.*

As noted, at the 2011 hearing the Board again denied parole, finding Lockett's release would present an unreasonable risk to public safety. The Board indicated it did not give much weight to the circumstances of the life crime because "it's a rather historic event at this point." The Board based the denial on five factors: (1) Lockett's attitude toward, minimization of, and lack of insight into the causative factors of, the crime; (2) his failure to complete an adequate "relapse prevention plan"; (3) his need for additional "victim awareness"; (4) his unstable social history as a youth; and (5) the psychological evaluation's assessment that he presented a moderate risk of recidivism and violent reoffense upon release. The panel observed that it was required to set the next parole hearing for a minimum of three years in the future, but strongly recommended that Lockett move, pursuant to section 3041.5, subdivision (d)(1), that the next hearing be advanced. The panel opined it "won't take you three years to complete what we've offered as far as what you need to work on today."

DISCUSSION

1. *Standard of review.*

The Board must set a parole release date one year prior to an inmate's minimum eligible parole release date, unless it determines that public safety requires a lengthier period of incarceration. (§ 3041, subds. (a) & (b); *In re Shaputis* (2008) 44 Cal.4th 1241, 1256 (*Shaputis I*); *In re Lawrence* (2008) 44 Cal.4th 1181, 1202 (*Lawrence*).) When determining parole suitability, the Board considers a variety of factors specified in the pertinent regulations, as well as any additional reliable and relevant information.[5] (*In re*

---

[5] Circumstances tending to establish unsuitability for parole include that the prisoner (1) committed the offense in an especially heinous, atrocious, or cruel manner; (2) has a previous record of violence; (3) has an unstable social history; (4) has sexually assaulted another individual in a sadistic manner; (5) has a lengthy history of severe mental problems related to the offense; and (6) has engaged in serious misconduct while in prison or jail. (Cal. Code Regs., tit. 15, § 2281, subd. (c); *Lawrence, supra*, 44 Cal.4th at p. 1202, fn. 7.) Circumstances tending to show suitability for parole include that the inmate (1) does not have a juvenile record of assaulting others or committing crimes with

*Shaputis* (2011) 53 Cal.4th 192, 218-219 (*Shaputis II*); *Lawrence*, at p. 1202, fns. 7 & 8; Cal. Code Regs., tit. 15, § 2281, subds. (b), (c) & (d).)  The overarching consideration is public safety.  (*Lawrence*, at p. 1209.)  Our review of the Board's decision is highly deferential, "far more so than the substantial evidence standard generally applied in appellate review of trial court decisions."  (*In re Davidson* (2012) 207 Cal.App.4th 1215, 1221; *Shaputis II*, at p. 210; *In re Shigemura* (2012) 210 Cal.App.4th 440, 451-452.)  A reviewing court focuses on " 'whether there exists "some evidence" demonstrating that an inmate poses a current threat to public safety,' " rather than merely whether some evidence supports the suitability factors.  (*Shaputis II*, at p. 209; *In re Prather* (2010) 50 Cal.4th 238, 251-252; *Lawrence*, at p. 1191.)  Only a modicum of evidence is required. Resolution of conflicts and the weight to be given the evidence are matters for the Board, and a court may not substitute its judgment for the Board's.  (*Shaputis II,* at pp. 210, 221; *Shigemura*, at pp. 450-451.)  The Board's decision must be upheld unless it is procedurally flawed or arbitrary.  (*Shaputis II*, at p. 212, 221.)  "Only when the evidence reflecting the inmate's present risk to public safety leads to but one conclusion may a court overturn a contrary decision by the Board or the Governor."  (*Id*. at p. 211.)  On the other hand, judicial review must be sufficiently robust to reveal and remedy any evident deprivation of constitutional rights.  (*Id*. at p. 215; *Lawrence,* at p. 1210; *Shigemura,* at p. 452.)

---

the potential of personal harm to victims; (2) has a stable social history; (3) has shown signs of remorse; (4) committed the crime as the result of significant stress in his or her life, especially if the stress built up over a long period; (5) committed the crime as a result of Battered Woman Syndrome; (6) lacks any significant history of violent crime; (7) is of an age that reduces the probability of recidivism; (8) has made realistic plans for release, or has developed marketable skills that can be put to use upon release; and (9) has engaged in institutional activities suggesting an enhanced ability to function within the law upon release.  (Cal. Code Regs., tit. 15, § 2281, subd. (d); *Lawrence*, at p. 1203, fn. 8.)

2. *The parole unsuitability finding was not supported by "some evidence."*

With the foregoing principles in mind, we conclude the Board's decision was not supported by "some evidence."

a. *Attitude, insight, minimization, victim awareness.*

A lack of insight into past criminal conduct "can reflect an inability to recognize the circumstances that led to the commitment crime; and such an inability can imply that the inmate remains vulnerable to those circumstances and, if confronted by them again, would likely react in a similar way. [Citations.] Thus, an inmate's 'lack of insight' can provide a logical nexus between the gravity of a commitment offense and a finding of current dangerousness." (*In re Rodriguez* (2011) 193 Cal.App.4th 85, 98; *Shaputis I, supra,* 44 Cal.4th at pp. 1260-1261 & fn. 20.) The presence or absence of insight "is a significant factor in determining whether there is a 'rational nexus' between the inmate's dangerous past behavior and the threat the inmate currently poses to public safety." (*Shaputis II, supra,* 53 Cal.4th at p. 218.) Here, however, the Board's conclusions that Lockett minimized his culpability for the crime, lacked insight into the causative factors of the crime, and needed more "victim awareness" are not supported by "some evidence" in the record.

The Board's conclusion that Lockett minimized the crime was primarily based upon a 2010 letter Lockett wrote to his victim, Singh, in which Lockett apologized for the crimes. Among other things, Lockett explained he had been ignorant, foolish, "lacked the basic essentials of character," and had adopted the "nihilistic mindset of urban youth." His "reality was dictated by [his] involvement in street gangs and drug usage." He "needed help—more emotionally than anything else." His parents were "unavailable emotionally" and he needed more structure in his life. Lockett stated, "In many ways the crime I perpetrated against you was a childish antic in an attempt to gain the attention of my parents. Being incarcerated seemed to be the only thing which caught their attention."

The Board faulted Lockett's characterization of the carjacking as a "childish antic," interpreting this remark as an indication of Lockett's minimization of the crime.

9

One of the panel members said, "I think you have no clue what a childish antic is. That's a prank. . . . That's, at wors[t], that's mischief. It's a disturbing the peace." When explaining the basis for the unsuitability finding, the panel stated that it wished to see Lockett "put the crime in a better perspective, understanding the nature and magnitude of the crime. Somehow, I think the Panel believes you get it, but when you say things like childish pranks it minimizes and begins to justify a very serious criminal act. And so you need to be able to put it in perspective that this was a life crime, not a childish prank."

There is no question Lockett's crime was vastly more serious than a "childish antic" or a prank. But Lockett's use of this single phrase does not provide evidence he lacks insight or has minimized the seriousness of the crime. At the hearing Lockett stated that he did not mean, by the phrase "childish antic," to minimize the crime but was simply trying to explain his lack of maturity and stability, his defiance toward authority, and his adoption of the gang mentality. He stated: "I'm taking no minimization. I'm not de-valuing the situation. I understand that I was wrong in this crime. And that this crime was very violent, and this crime caused harm, significant harm, to this individual, although not physically, mentally. And I'm not trying to change that fact." Lockett pleaded guilty to the offenses and told both the Board and the psychologist that he accepts the official version of the crime was accurate. He has not attempted to deflect blame for the crime. He has repeatedly acknowledged that his crime was very violent and traumatized the victim. He also readily acknowledged that the high-speed chase he instigated endangered everyone in the neighborhood, as well as passengers in his car. The evidence here does not resemble that in the authorities cited by the Warden. (See, e.g., *In re Tapia* (2012) 207 Cal.App.4th 1104, 1113 [contrary to the evidence, inmate denied planning a murder]; *In re Shippman* (2010) 185 Cal.App.4th 446, 460-462 [inmate repeatedly denied or minimized past incidents in which his irrational need to control his romantic partners resulted in emotional or physical violence].) While Lockett's choice of words was ill-advised, his use of the single phrase "childish antic" does not amount to some evidence he has minimized the seriousness of, or his role in, the crime.

The Board's conclusion that Lockett has failed to develop sufficient insight into the causative factors of the crime is also factually unsupported by "some evidence." The Board stated Lockett understood "the external factors" that led to the crime, that is, he lived in a gang area, joined the gang, and adopted the gang mentality. The Board also stated it was "confident that, as far as the life crime itself, you have internalized the factors about the life crime itself." But the Board opined that Lockett needed to further explore the "internal factors that drove you to go into the gang versus the same youthful individuals who chose to go down a different path in the same neighborhood. . . . And that's that piece that we just believe that you have a little more work to do on." Another commissioner stated, "in terms of your youthfulness and your perceptions of that, there is some minimization going on. There's some rationalization going on in terms of your own inner psychic understandings, your own inner psychic dealings." The Board also complained that Lockett had intellectualized the incident too much in the letter to his victim.[6]

The Board's finding is unsupported by some evidence. Lockett has not denied committing any aspect of the crime; he has not challenged the version of the crime as set forth in the probation report, nor has he made implausible excuses for his actions. At the 2011 hearing, Lockett told the Board he had been depressed; had trouble adjusting after being paroled from the youth authority; and had not been mature enough to cope with the pressures of life. He had "trust issues," issues with his parents, and difficulty communicating and expressing himself. He had been unwilling to accept authority. His parents did not provide the emotional support he needed, and he got into trouble with gangs in order to obtain their attention. This combination resulted in his being "very unstable." When faced with adult responsibilities, he "went back to [his] old ways." He

---

[6]     The Board's complaint on this point appears to be at odds with the Board's concurrent advice that Lockett develop more insight into the causative factors of the crime.

11

"went to what was easy" for him. He felt he had been trying to return to jail because that was easier than going to work. At the time of the crime he was "obsessed" with getting a car so he could travel to Northern California where his father lived, where he perceived things would be more secure. He felt "out of control," that is, " 'not knowing where he was going,' " and in " 'a state of desperation' " when he was in the Los Angeles area. It "still [did] not make any sense to him why he did the crime." Further, he told the psychologist in 2010 that in the past, he had been " 'impulsively driven,' " that is, "he would have things build up in him, until he would decide he had had enough." A panel member observed that the latter comment was "insightful." Lockett told the psychologist that when he participated in a gang fight or crime, he "did it for the excitement of the moment," even though he knew what he was doing was wrong. Additionally, Lockett told the psychologist that he had learned through attending AA and NA that he used drugs as a teen to ward off depression and loneliness, as an escape, and as part of the gang lifestyle. His anger, instability, and immaturity made him "not . . . able to logically think correctly. To know that I was doing something wrong but still be hindered from concluding a better response to dealing with my frustrations and anger." Lockett told the psychologist, " 'The primary reason that would prevent me from ever doing that [wrong] again is that no one should ever do harm to others, and that is now my spiritual orientation. I was a criminal, and an outlaw. I am a citizen now. I ask for help if I am stuck now.' "

Neither the 2010 Psychological Evaluation nor the 2007 Psychological Evaluation indicated Lockett lacked insight into the causative factors of the crime. To the contrary, the 2007 Psychological Evaluation stated Lockett "evidenced insight into his behavior, especially describing a turning point experience that brought about a change in his attitude, perception, and demeanor. This recognition shifted his focus from self-centeredness to an outer directed future orientation that accepted responsibility and accountability for his life actions." The 2010 Psychological Evaluation stated that Lockett had accepted responsibility, believed his sentence was fair and deserved, demonstrated remorse for his actions, and had the capability to empathetically understand

12

the consequences of his crime and how his present actions affect others. "The positive shift[] in his attitudes and in his behaviors since about 2003, is documented in his records, and also in how he conveys the changes that have been occurring in himself since that time." Indeed, the Presiding Commissioner at Lockett's 2009 hearing opined that "you do show insight . . into your life as a whole, the causative factors of the crime, your gang activity, the whole bit. . . . [Y]ou show true remorse."

Lockett's statements indicate he has significant insight into the internal psychological factors that impelled him to commit the crimes, as do the 2007 and 2010 psychological evaluations and the statements of the 2009 panel. The 2011 Board was not, of course, required to accept the findings of either the psychologists or the earlier Board. (See *Shaputis II, supra,* 53 Cal.4th at p. 213; *In re Rozzo* (2009) 172 Cal.App.4th 40, 62 [parole authority has broad discretion to disagree with the State's forensic psychologists].) But review of the record as a whole does not reveal evidence from which the panel could reasonably have concluded Lockett's statements were insufficient and the psychologists' impressions were wrong. As our Supreme Court has noted, "expressions of insight and remorse will vary from prisoner to prisoner and . . . there is no special formula for a prisoner to articulate in order to communicate that he or she has gained insight into, and formed a commitment to ending, a previous pattern of violent behavior." (*Shaputis I, supra,* 44 Cal.4th at p. 1260, fn. 18.)

The circumstances here contrast with cases in which there was evidence of inadequate insight. In *Shaputis II*, for example, the inmate was convicted of murdering his second wife after he shot her in the neck from close range after an alcohol-fueled argument. Among other things, he maintained that the shooting was accidental in the face of strong evidence to the contrary; he denied he had a problem in the way he treated women, despite his history of domestic violence and molestation of one of his daughters; psychological reports reflected that his character remained unchanged and that he was unable to gain insight into his antisocial behavior despite years of therapy and programming; and his prepared statement about the crime was "so vague about the nature of his violent conduct that it might reasonably be deemed evasive." (*Shaputis II, supra*,

13

53 Cal.4th at p. 214.) Under these circumstances, a "general recognition of moral deficiency and alcohol abuse [was] insufficient to explain an entrenched pattern of domestic abuse, child molestation, and a pointblank shooting." (*Ibid.*) In *In re Shigemura, supra,* 210 Cal.App.4th 440, the inmate's statements showed she had never "come to grips" with her role in the crime. (*Id.* at p. 450.) Her portrayal of herself as a passive, detached observer, rather than an active participant in the crime, demonstrated she was still "engaged in a great deal of rationalization of and detachment from her role in [the victim's] death." (*Id.* at p. 457.) In contrast, Lockett testified at the hearing that he was responsible for carjacking Singh at gunpoint, placing him in the trunk, and leading officers on the high-speed chase. He has not minimized or implausibly excused any aspect of his crime. Nothing in the record before us evidences the kind of inability or refusal to accept responsibility for, or articulate the reasons for his commission of, the crime.

The Board also opined that Lockett needed to do more to develop "victim awareness." To the extent this was offered as a basis for the parole denial, it is also unsupported by the evidence. One of the commissioners at the hearing asked how many people Lockett regarded as his victims. The Commissioner explained that in addition to the people Lockett named, the victims were all those persons who indirectly suffered as a result of Lockett's behavior. The Commissioner gave the following example: as the result of a robbery, a child would go to bed hungry; as a result of the hunger, the child would cry; the constant crying would lead the child's parent to abuse the child; and the abused child might grow up to abuse his or her own children. Thus, the victims of Lockett's crimes included all those persons who were indirectly affected. Lockett readily agreed with this broader view and answered the commissioner's questions appropriately.[7]

---

[7] For example, the Commissioner asked, "When you were involved in robberies and you took someone's money or their possessions . . . [w]hat happens if the money you just got was dinner?" Lockett replied, "Then kids don't eat. Yes. I understand that the primary victim isn't the victim of the crime, but it's also their families and extended families for that matter." The Commissioner then asked, "if we talk about your years on

14

Lockett explained at the hearing that he understood his crime must have caused the victim much stress, anger, and frustration, and that the crime was "a horrible thing." He acknowledged that the victim might "still fear being a victim," might fear activities such as going out at night or being alone in parking lots as a result of his crime, and that such fears might adversely impact the victim's life. Lockett told the psychologist in 2010 that what he did to the victim was very traumatic, and would probably affect the victim's interactions. The psychologist opined that Lockett had the capability for empathetic understanding of the consequences of his actions. Thus, the record does not contain evidence that Lockett lacks victim awareness.

b. *Relapse prevention plan.*

At the hearing, the Board asked Lockett if he had a "relapse prevention plan." Lockett replied that he did. He explained he had participated in a men's support group while in prison, which had an outside branch in Oakland where he hoped to parole. He anticipated being able to rely on that group for help, training, assistance dealing with stress, and to discuss "core emotions." AA and NA also had active branches in the area where he hoped to parole. Moreover, he had been preliminarily accepted into a program offered through San Francisco State University. In regard to his general parole plans, Lockett explained he would obtain religious support from the Islamic community and the Zaytuna Institute of Berkeley. He had explored several options for transitional living, including the Rubicon International program and the Delancey Street program, which a panel member characterized as a "very, very well thought of and respected program."

The Board viewed Lockett's efforts at self-help and programming favorably. Panel members stated, "you've done a considerable amount of educational, vocational, self-help and parole planning." "You are able to do self-study and apply it to yourself. You've done a tremendous job at that." "Your self-help programming . . . is definitely showing in terms of your responses and your presentation today." "You've done a

the street with the gang terrorizing the neighborhood how many victims have you left behind?" Lockett replied, "That number, it can just continue to go."

lot . . . . And we recognize your accomplishments, and they are many." The only area of purported deficiency cited was Lockett's failure to internalize a "relapse prevention plan." The Board explained: "You have a good piece of that plan in place with the research you've done for your parole. And we will commend you on that because you've done tremendous work. But the piece that's missing is the more important steps in a plan that will . . . assist you in remaining clean and sober when you're out . . . and . . . the restrictions are gone. . . . You've got the programs. You've got the connections. You've got where you would turn. What you don't have is the transition. What are my triggers? What do I have to avoid? How do I make that look? And you have to know those things not just, you need it on a piece of paper, but you need to know it so that it's a part of who you are. You've internalized it." Such a plan was necessary in light of Lockett's teenage history of substance abuse.

As set forth *ante,* the record shows Lockett used marijuana and cocaine as a youth. The psychologist stated that Lockett needed to continue substance abuse programming if released on parole. If he did so, his "prognosis for his ability to refrain from future use in the free community appear[ed] to be good . . . , pending his continuing with substance abuse programming, and his ongoing clarification of issues he might need to work with related to substance abuse as they apply to his life at present, and also as he would need to deal with them in the future, when on parole." Conversely, his risk for violence would go up if he engaged in substance abuse.

Thus, the Board could reasonably conclude that to demonstrate suitability for parole, Lockett would have to show he had taken steps to address substance abuse both in and out of prison. But the record reflects he had done so. He attended NA and AA for a period while incarcerated. The 2010 Psychological Evaluation stated: "Inmate Lockett appeared to realistically assess both his past use of substances, and the plans he has for relapse prevention, while incarcerated, and also when living in the community." Furthermore, the evidence showed Lockett had "identified his triggers." The 2010 Psychological Evaluation explained that through attending AA and NA, Lockett "discovered his issues with drugs, were more related to the causes that led him to use

drugs, rather than being addicted to, or dependent on drugs. He came to the conclusion he used drugs to ward off depression and loneliness. The drugs served as an escape. He also recognized his addiction to the gang lifestyle, and some of his drug use was in part related to that as well."

Moreover, there was no evidence Lockett was addicted, or that at the time of the hearing, had a substance abuse problem. Lockett had no disciplinary violations related to substance abuse. His pattern of use as a teenager showed he was able to cease use without withdrawal symptoms. Significantly, there was no evidence the life crime was related to substance abuse. Given the Board's praise for the bulk of Lockett's relapse plan, his participation in NA and AA, and the statements showing he has identified his "triggers," no evidence supports a conclusion that the state of Lockett's relapse plan indicates current dangerousness. (Cf. *In re Stevenson* (2013) 213 Cal.App.4th 841, 869-870 [shortcomings in relapse plan were a factor supporting unsuitability finding where the inmate had a long history of alcohol and drug abuse; he abruptly quit a job to focus on selling drugs; he sold crack cocaine for months before the commitment offense; drug use was a factor in the commitment offense; he continued substance abuse for some time while in prison; he had been diagnosed with alcohol and cannabis abuse; and the psychologist opined that his relapse plan was deficient, increasing his risk of dangerousness]; see generally *In re Loresch* (2010) 183 Cal.App.4th 150, 161-162.)

c. *Unstable social history and prison misconduct.*

The Board concluded Lockett's "unstable social history" weighed against release. It referenced Lockett's youthful gang membership, drug use, and failure to profit from grants of probation and parole from the CYA.

A prior record of violence and an unstable social history are factors tending to show unsuitability for parole. (Cal. Code Regs., tit. 15, § 2281, subd. (c)(3).) Here, Lockett's teenage substance abuse, pre-incarceration gang membership, and juvenile record are temporally remote, immutable factors, occurring approximately 17 years before the 2011 hearing. Where the Board considers immutable factors to be predictive of current dangerousness, "it must articulate why that is the case. [Citation.]

17

' "[I]mmutable facts such as an inmate's criminal history" . . . do not by themselves demonstrate an inmate "*continues* to pose an unreasonable risk to public safety." ' " (*In re Denham* (2012) 211 Cal.App.4th 702, 717; *Lawrence, supra*, 44 Cal.4th at p. 1221; *In re Sanchez* (2012) 209 Cal.App.4th 962, 975.) These factors remain relevant to the assessment of Lockett's current dangerousness only if something in Lockett's pre- or post-incarceration history, or current demeanor and mental state, "indicate[] that the implications regarding the prisoner's dangerousness" deriving from them remain probative. (*Lawrence*, at pp. 1214, 1221; *In re Ryner* (2011) 196 Cal.App.4th 533, 545.) The Board did not articulate such a nexus, and the record does not reveal one.

As we have noted, Lockett was not diagnosed with a drug or alcohol dependency. The psychologist opined that his pre-incarceration substance use was social and related to his gang affiliation, not criminality. He was never disciplined in prison for substance abuse-related offenses. Alcohol and drugs played no role in the commitment offense. While incarcerated, he attended available substance abuse programming consistently and was "incorporating what he has learned into his rules of thinking and behavior." The 2010 Psychological Evaluation determined that his prognosis for his ability to refrain from substance abuse in the free community appeared good, providing he continues with substance abuse programming. He "realistically assess[ed] both his past use of substances, and the plans he has for relapse prevention." Under these circumstances, the Board's mere reference to Lockett's prior substance use does not provide any evidence he currently presents a danger to society. (See *In re Loresch, supra,* 183 Cal.App.4th at pp. 161-162.)

Nor does Lockett's juvenile gang membership currently provide evidence of current dangerousness. Lockett formally debriefed from the gang in approximately 2003. This process required that staff evaluate Lockett to conclude he had actually dropped out of the gang and entailed Lockett's cooperation in providing information about the gang's structure, activities, and affiliates. (See Cal. Code Regs., tit. 15, § 3378.1.) Lockett told the Board he has rejected the gang lifestyle and actively encourages other inmates to stay away from prison gangs. The Board appears to have credited these averments. The

18

Board did not explain how Lockett's juvenile gang membership demonstrates current dangerousness. Given that Lockett is no longer gang-affiliated, his juvenile gang membership provides no evidence of current dangerousness. Similarly, the Board articulated no nexus between Lockett's failures to profit from juvenile probation and current dangerousness. (See *In re Sanchez, supra,* 209 Cal.App.4th at pp. 974-975 [inmate's two probation failures 17 years earlier did not demonstrate a current risk to public safety]; see generally *In re Moses* (2010) 182 Cal.App.4th 1279, 1312.) Rote recitation of immutable historic factors does not suffice to establish current dangerousness. (*Id*. at p. 1304.) The record does not provide any other evidence of an unstable social history. The 2010 Psychological Evaluation concluded Lockett has "no evidence of relationship instability." (See *In re Denham, supra,* 211 Cal.App.4th at p. 717.)

The Warden argues that Lockett's prison misconduct supported the Board's finding. The Board did not, however, cite Lockett's disciplinary history as a factor supporting its unsuitability finding. To the contrary, the Board stated the only area of institutional adjustment that was of concern was Lockett's relapse plan. The Board observed that "disciplinary-wise you have managed to stay out of trouble since 2003. And . . . your positive efforts to rehabilitate yourself have led to you being assaulted in 2009.[8] So you're definitely a man of conviction who . . . seems to have set himself on a course that you're going to finish out." Our review of the record for "some evidence" is not limited to the evidence directly specified by the parole authority. (*Shaputis II, supra,* 53 Cal.4th at p. 214, fn. 11.) But here, the Board appears to have viewed Lockett's nine years of discipline-free behavior as a positive factor overcoming any negative inferences

---

**8** Lockett testified that a year and one-half before the 2011 hearing, another inmate stabbed him. Lockett was the chairman of an NA group, gave sermons and taught classes on morals and ethics, apparently in connection with his Islamic faith, and through these activities attempted to steer others away from gangs. A group of inmates were hostile to these activities, precipitating the attack.

that might be drawn from his earlier prison misconduct. We are not at liberty to substitute our judgment for the Board's on this point.

d. *Risk assessment.*

Finally, the Board pointed to the fact that Dr. Lehrer, the psychologist who prepared the 2010 evaluation, concluded Lockett fell within the "[m]oderate range for violence in the free community." (Italics omitted.) Dr. Lehrer relied upon three diagnostic tools: the PCL-R, the HCR-20, and the LS/CMI. The PCL-R and the HCR-20 estimate the risk for future violence in the community. The LS/CMI estimates the risk for general recidivism. Lockett scored in the moderate or medium range in each. However, Dr. Lehrer explained that Lockett's risk assessment was elevated due in large part to historical factors. As to his score on the HCR-20, Dr. Lehrer explained: "Given that the bulk of data is historical, then by definition, these scores are not easily amenable to significant change, regardless of the number of years of his incarceration. [¶] It should also be noted that the Inmate's historical record represents a very large component contributing to his overall moderate risk rating. The other areas of the measure currently have very little contribution to his risk of violence. Thus, while Inmate Lockett may never have a less elevated total score on this measure, his maintaining prosocial functioning can over time continue to reduce the significance of his risk of violence on this measure." No current factors "were endorsed," that is, elevated his risk.

Similarly, in regard to the PCL-R, Dr. Lehrer explained: "Inmate Locket[t]'s scores on the PCL-R take into account a combination of his history as reviewed, and his current clinical presentation. . . . [I]tems must be scored based upon the lifetime history of the individual, rather than upon more recent behavior alone." As to the LS/CMI, the items which contributed to increased risk were Lockett's prior convictions, the fact he was arrested or charged prior to age 16, his punishment for institutional misconduct, his history of expulsion and suspension from school, his acquaintance with criminals, his past drug abuse, his personality disorder, his "early and diverse antisocial behaviors," his gang involvement, and his history of physical violence with a weapon.

In regard to Lockett's diagnosis of an antisocial personality disorder, Dr. Lehrer's report explains: "Inmate Lockett engaged in a pervasive pattern of antisocial behaviors, violence and criminality from about the age of 11, extending until about 2002. He does meet the criteria of having had a conduct disorder based on his history of criminality and aggression as an adolescent. Since 2002 he has been demonstrating greater controls and personal maturation. This history is best diagnosed as Antisocial Personality Disorder on Axis II."

Thus, the vast majority of the factors elevating Lockett's risk assessment and resulting in his personality disorder diagnosis were historical. Lockett's elevated scores could theoretically be used to deny parole forever. Using a risk assessment elevated almost entirely by preconviction historical factors is little different than relying upon the heinous nature of a commitment offense to deny parole year after year. As with the evaluation of other immutable historical factors (see *Lawrence, supra,* 44 Cal.4th at pp. 1212-1214), a risk assessment that is elevated due to historical factors supports a parole denial only if it provides "some evidence" of current dangerousness. Such a test score is probative of current dangerousness only to the extent the historical facts themselves remain probative of current dangerousness. As we have discussed, there is no evidence that they do so here.

In sum, because the Board's unsuitability determination was not based on "some evidence," we grant Lockett's petition for a writ of habeas corpus and remand for a new hearing in accordance with due process of law. (*In re Prather, supra,* 50 Cal.4th at p. 244.) The Warden requests that because section 3043 requires at least a 90-day notification period to the victim before a parole hearing, the deadline for a hearing on remand be set for no less than 120 days after this opinion's finality.[9] The Warden's point is well-taken, and we order the hearing scheduled accordingly on remand.

_____

[9] Section 3043, subdivision (a)(1) provides: "Upon request . . . notice of any hearing to review or consider the parole suitability or the setting of a parole date for any prisoner in a state prison shall be" given "at least 90 days before the hearing to any victim of any crime committed by the prisoner . . . ."

**DISPOSITION**

Lockett's petition for a writ of habeas corpus is granted. The matter is remanded to the Board of Parole Hearings for a new hearing comporting with due process, to be held within 120 days of the finality of this opinion. In the interests of justice, this opinion is made final as to this court five days after its filing.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

ALDRICH, J.

We concur:

KLEIN, P. J.

KITCHING, J.