Filed 10/22/15  In re Wimberly CA4/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| In re KENT WIMBERLY<br><br>on Habeas Corpus. | D067596<br><br><br>(Super. Ct. No. HC19909) |

Original proceeding on a petition for a writ of habeas corpus following the Governor's reversal of a grant of parole.  Relief granted.

Charles F.A. Carbone for Petitioner.

Kamala D. Harris, Attorney General, Jennifer A. Neill, Assistant Attorney General, Phillip J. Lindsay and Linnea D. Piazza, Deputy Attorneys General, for Plaintiff and Respondent.

Kent Wimberly has been incarcerated over 35 years on a 25-year-to-life sentence for first degree murder.  After an unsuccessful parole hearing in 2009, the Board of Parole Hearings (Board) found him suitable for parole at a 2012 parole hearing.  Governor Edmund G. Brown Jr., however, reversed the Board's decision, finding Wimberly did not sufficiently address the factors that led him to commit his life crime.

Most recently, at a parole hearing on March 12, 2014, the Board granted Wimberly parole. Nevertheless, the Governor again reversed the Board's decision because of the "shocking" nature of the life crime and Wimberly's lack of insight into the causative factors of the life crime. Wimberly filed a petition for a writ of habeas corpus with the superior court, which denied the requested relief. He then filed the present petition for writ of habeas corpus with this court, contending that the Governor's decision is not supported by some evidence, and the Governor did not adequately consider the factors of Wimberly's youth, as required by Penal Code[1] section 3051, because he committed the life crime when he was 17 years old. We conclude the record does not contain "some evidence" to support the Governor's ultimate conclusion that Wimberly was unsuitable for parole because he currently poses an unreasonable risk to public safety. Accordingly, we grant Wimberly habeas relief and order reinstatement of the Board's parole release order.

FACTUAL AND PROCEDURAL BACKGROUND

Although the Governor reversed the Board's decision to grant Wimberly parole, he lauded Wimberly for earning his associate of arts degree and completing vocational programs as well as participating in self-help classes. In addition, while Wimberly has been incarcerated for over 35 years, he has not been disciplined in prison for serious misconduct since 1988. Also, neither the Board nor the Governor took issue with Wimberly's postparole plans, and it is clear from the record that he has multiple housing

---

[1] Statutory references are to the Penal Code unless otherwise specified.

2

options and employment opportunities upon his release. As such, we do not discuss in detail any of these facts. Instead, because the central issues here are the nature of the life crime and whether some evidence exists that Wimberly lacks insight into his commitment offense, we focus on these two issues.

The Commitment Offense[2]

Because Wimberly pled guilty to two counts of first degree murder, we take the facts of his commitment offense from the San Diego County Probation Officer's Report dated April 16, 1980 as summarized in the record:

"[O]n September 3, 1979, at approximately 8:40 PM a neighbor heard commotion coming from the residence of victims Leon Lauterbach and his girlfriend Gloria Liebrenz. Leon's son Eric lived with them and Eric had recently graduated [from high school] with his friends Kent Wimberly and Kay Moore. At approximately 10:55 PM another neighbor was walking his dog when he discovered the body of a woman in front of the Lauterbach home. When police arrived they discovered the body of Leon Lauterbach inside the home. Both victims had multiple stab wounds. Mr. Lauterbach died from a hemorrhage in his chest and Ms. Liebrenz died from a hemorrhage of a severed artery in her abdomen. The subsequent investigation revealed that Eric Lauterbach had made plans with his friend Kent Wimberly to murder his father and his

---

[2]    Wimberly pled guilty to two counts of first degree murder. The court sentenced Wimberly to prison for two concurrent terms of 25 years to life. Throughout the record, the Board, the Governor, the doctors who evaluated Wimberly, and the parties refer to Wimberly's life crime in the singular although both murders are thoroughly discussed. For the sake of consistency, we refer to life crime in the singular as well in this opinion although we are aware and discuss the fact that Wimberly murdered two individuals.

father's girlfriend. Mr. Wimberly . . . entered a plea to two counts of first-degree murder." He was 17 years old when he committed the murders.

Evidence and Discussion of Insight in the Record

*Risk Assessments of Wimberly*

Three comprehensive risk assessments of Wimberly were part of the materials considered by the Board and the Governor in the instant matter. The first was prepared by J. Larmer, Psy.D., after meeting with Wimberly on March 28, 2012. In the assessment, Larmer noted: "While it is clear that Mr. Wimberly demonstrated characteristics or traits of Personality Disorder in his youth, there is no evidence to conclude that he has demonstrated such traits or features in many years. His relationships with others appear to be long standing and positive in nature, he does not demonstrate manipulative or antisocial attitudes or behaviors, he has consistently abided by the rules of the institution for many years, and by all accounts he gets along well with others, is respectful, hard working and avoids interpersonal problems."

Larmer also noted: "Wimberly has spent a great deal of time and emotional energy examining the crime, his motivation and the underlying factors which contributed to his decisions and behaviors. Over the years of incarceration he has engaged in individual and group therapy as well as self-help groups aimed at assisting him in understanding the personality factors and situational factors which contributed to the crime. He demonstrates a significant amount of insight into the casual factors of the life crime." Larmer additionally observed, Wimberly "expresses credible remorse for the crime and empathy for the victims and their families."

4

R. Stotland, Ph.D., prepared the second assessment after meeting with Wimberly on July 19, 2013. Stotland concluded that Wimberly "showed generally fair to good insight" into his life crimes.

The most recent assessment was prepared by Richard Hayward, Ph.D., after meeting with Wimberly on January 24, 2014. Hayward concluded that Wimberly represents a low risk for violence and is a nonelevated risk for violence relative to life term inmates and other parolees. Hayward also determined that "Wimberly has developed understanding of the primary factors that contributed to his commitment offense."

Hayward's analysis emphasized the immaturity of Wimberly's thinking at the time of the life offenses: "He decided to murder Mr. Lauterbach and Ms. Liebrenz with a desperate hope that Eric would be pleased and their friendship would continue. . . . [H]is thinking was immature at the time because he had no resources that would allow him to communicate his thoughts and feelings and help him understand his emotional turmoil and find assistance. He now expresses appreciation of his overwhelming adolescent emotional problems and he explains that he is horrified that he made the decision to commit two murders. He has developed the communication skills he was lacking in adolescence and he now feels comfortable expressing his feelings and communicating with supportive friends and family members. He feels accepted as a gay man and he has developed a supportive network of Christian friends. He associates primarily with pro-social individuals and he expresses a genuine commitment to follow the guidelines of his Christian faith. He has expressed understanding that his rage at the time of the murders

5

was a reaction to his deep feelings of hurt as a misunderstood adolescent with no connection to anyone except Eric."

Hayward also wrote about Wimberly's maturation while incarcerated: "Wimberly has matured substantially while incarcerated and he has developed understanding of the maturity of his thinking and behavior at age 17. He is now able to appreciate the extensive pain he caused to Mr. Lauterbach and Ms. Liebrenz and to their families. . . . He has developed a substantial sense of responsibility."

*Parole Hearing in 2012*

At a parole hearing on September 20, 2012, the Board determined that "Wimberly does not pose an unreasonable risk of danger to society or a threat to public safety, and is therefore eligible for parole at this time." In reaching this decision, the Board noted that Wimberly had admitted to committing the life crime and took full responsibility for his actions. Further, the Board read from Larmer's assessment of Wimberly, emphasizing Larmer's opinion that Wimberly was a low risk to reoffend if released and demonstrated a significant amount of insight into the causative factors of his life crime.

The Governor reversed the Board's decision. In doing so, the Governor stated he was concerned by the "heinous and appalling" nature of Wimberly's life crime. Also, the Governor stated that he was "not convinced that Mr. Wimberly has sufficiently addressed the factors that led to the murders or the compulsion to kill that he described to the Board in 2012."

6

*Present Parole Hearing*

At Wimberly's most recent parole hearing, the Board asked Wimberly why he murdered two people.  In response, Wimberly stated that "it's been an ongoing process for me to learn about all these different factors that have contributed to why I did what I did."  He then identified several factors that caused him to kill the victims.

Wimberly was molested when he was young.  He was physically, emotionally, and socially immature at 17 years old.  He lacked adequate communication skills.  He had similar problems to other children, but he was unable to talk to anyone about those problems.  He was very self-absorbed and self-focused.  Wimberly believed other people were being judgmental and critical of him.  He thus did not take responsibility for his feelings, but instead, blamed others for his bad attitude.

Wimberly also admitted that he had a "total lack of empathy" at age 17.  He linked this shortcoming with his immaturity.  He explained that he had a "desperate, desperate need" to connect to a male figure.  Wimberly stated that this need was fueled by his father being away at certain critical times as well as his same sex attraction.  He had difficulty making friends and could not express his sexuality.  He became "panicky over it."

Wimberly felt alone, unable to talk to anyone, which caused him to experience hopelessness.  His father was homophobic.  Wimberly became "very suicidal" at 17 years

7

old and did not see a "normal" future for himself because he was homosexual.[3]  He became lost and very angry.  He was bullied at school and became angry at the bullies.  He turned to his parents for help, but he perceived his parents as being critical and judgmental.[4]  His father told him to grow up and be a man while his mother babied him.

He recalled being eight years old and his parents took him to the doctor to figure out why he was still wetting the bed and sucking his thumb.  He stated he felt humiliated and his "animosity and hatred" started building toward his parents.  As he got older, his rage toward his parents grew and he wanted to find a way to move out.

Wimberly highlighted additional insight he gained after his 2012 parole hearing:

> "[G]oing through this process of discovery and answering the question why, the newer insight that I've had, even since the last hearing, even since the Governor's denial when he said that there seemed to be something missing there, and I believe there has been, is that I wasn't just angry at my parents, but that I had projected my anger toward my parents on to Eric's parents.  And that part of me wanted to be like Eric, but another part of me wanted Eric to be like me.  And when I saw Eric, I saw myself.  And when I saw his situation, I saw my situation.  And when I saw his difficulties with his parents, I saw my difficulties.  And when I saw his desire to kill

---

[3]    Wimberly further explained his feelings of isolation and thoughts of suicide to Hayward.  He discussed that he was longing for a connection to a male figure when he met Eric Lauterbach.  He finally felt the connection he believed he was missing.  He wanted to be Eric's best friend, and pined for his acceptance and approval.  Wimberly identified with Eric's anger toward his own parents.  When Eric talked about killing his father, Wimberly was happy to be his sounding board.  Eric's emotional vulnerability generated the intimacy Wimberly craved.  Wimberly and Eric went camping together and had a sexual encounter, which had a profound impact on Wimberly.  He wanted more contact with Eric, but Eric rejected him.  Wimberly felt hopeless, isolated, and became suicidal.

[4]    Because of his father's homophobia, Wimberly did not believe he could talk to his father about his feelings of same sex attraction that he was experiencing as a teenager.

8

his parents, I saw my desire to kill my parents. Even though those feelings were not acknowledged in my mind at that time, I see that now. And I've not wanted to admit that because as horrific as the crime is, to me it's a whole nother [sic] of - - it's a whole nother [sic] level of horrificness [sic] to say that the driving force of killing Leon and Gloria, what enabled me to have such violence, what enabled me to continue with the crime and not stop when there were multiple opportunities to stop, to have that lack of empathy and caring for them, was that at some level that I didn't understand at the time, was killing my own parents."

Wimberly also responded to his attorney's question about his reaction to the Governor's reversal of the Board's decision in 2012. Among other comments, Wimberly stated that the Governor "was right" and that he needed to obtain "more clarification" to "come up with some additional thoughts and explanations about how [his] relationship with [his] parents had a huge impact on the crime that [he] committed."

The Board again found that Wimberly did not pose an unreasonable risk of danger to society or threat to public safety and was eligible for parole. In reaching this decision, the Board stressed that it was applying section 3051 and gave "great weight" to Wimberly's "diminished capacity" as a juvenile because he committed his life crimes when he was 17 years old. The Board also pointed out that it reflected on the "hallmark features of youth as well as the subsequent growth and maturity that the offender develops during his incarceration."

In addition, the Board noted Eric Lauterbach became a negative influence on Wimberly when he solicited Wimberly's help to kill his father. The Board determined that Eric's influence as well as other outside pressure impacted Wimberly because of

9

Wimberly's immaturity and "underdeveloped sense of responsibility that sometimes results in impetuousness and ill-considered actions and decision."

The Board was satisfied that Wimberly accepted responsibility for his life crime (many years ago) and developed some empathy and remorse. Also, the Board emphasized Wimberly's lack of a criminal history (except for the life crime), self-help programming, model behavior while incarcerated, strong relationship with his parents, and solid parole plans supported its decision.

The Board found that Wimberly was a low risk to violently reoffend. In terms of insight, the Board stated:

> "But of particular note is that on - - for 2-1/2 pages, from pages 8 through 11 of 15, the doctor details the factors of insight that led to the life crime. Which I think is very significant because that is an issue that certainly the Governor was concerned about, that the District Attorney has voiced concern about, and this Panel was very concerned about as well. But clearly the doctor has noted not only the significant insight that you have developed into the causative factors of the life crime, but as your attorney pointed out, you did detail at least 23 different causative factors, and you talked about them in detail during the hearing. So we don't have any reservations in that regard today."

The Governor's Reversal

Like after the 2012 parole hearing, the Governor again reversed the Board's decision to grant Wimberly parole after his most recent parole hearing. The Governor noted all the positive steps Wimberly took while incarcerated (obtaining AA degree, completing vocational classes, participating in self-help classes) and gave "great weight to Mr. Wimberly's diminished culpability, the juvenile characteristics that made him susceptible to commit this crime, and his subsequent growth and maturity." Although the

Governor commended Wimberly for "taking positive steps," he concluded that Wimberly's positive characteristics were outweighed by negative factors that demonstrate that Wimberly is unsuitable for parole.

The Governor stressed the "shocking" nature of Wimberly's life crime. He noted that Wimberly "brutally murdered" the victims in their home after they invited him inside. Further, the Governor stated that Wimberly's method of killing (stabbing) demonstrates "a cruel and callous disregard for human suffering."

The Governor also found Wimberly exhibited a lack of insight. The Governor observed:

> "I reversed Mr. Wimberly's grant of parole in 2013, because I was troubled by Mr. Wimberly's explanation for this vicious crime. I continue to have the same concern today. Mr. Wimberly told the psychologist in 2014 that Mr. Lauterbach began to avoid him after the two had a sexual encounter, and he 'offered to help with the murder so [he] could get in with Eric again.' Mr. Wimberly went on to say '[t]he reality of it was not hitting me. I felt I needed to be part of this to cement my relationship with Eric' and that Mr. Lauterbach would be 'indebted to me forever and couldn't kick me to the curb.' The fact that Mr. Wimberly murdered two people in cold blood to 'cement' his relationship with his friend remains disturbing and is not adequately explained. Mr. Wimberly has not fully addressed the factors that led him to believe that stabbing two individuals to death was necessary to mend his relationship with his friend. I encourage Mr. Wimberly to continue participating in self-help classes, and seek mental health services, to help gain a better understanding of the reasons he resorted to murder solely for the purpose of maintaining a friendship, however intense."

For these reasons, the Governor found "the evidence shows that [Wimberly] currently poses an unreasonable danger to society if released from prison."

11

## DISCUSSION

## I

*THE GOVERNOR'S REVERSAL IS NOT BASED ON SOME EVIDENCE*

### A.  The Parole Suitability Framework

As this court recognized in *In re Vasquez* (2009) 170 Cal.App.4th 370 (*Vasquez*), "[t]he granting of parole is an essential part of our criminal justice system and is intended to assist those convicted of crime to integrate into society as constructive individuals as soon as possible and alleviate the cost of maintaining them in custodial facilities. [Citations.]  Release on parole is said to be the rule, rather than the exception [citations] and the Board is required to set a release date unless it determines that 'the gravity of the current convicted offense . . . is such that consideration of the public safety requires a more lengthy period of incarceration . . . .' " (*Id.* at pp. 379-380; italics omitted.)

Because Wimberly committed his life crime while he was 17 years old, the Board applied section 3051 in considering Wimberly's eligibility for parole.  (§ 3051, subd. (a)(1).)  That section requires the state to provide a juvenile offender with a meaningful opportunity to obtain release within his or her expected lifetime.  (§ 3051, subd. (b)(1)-(3).)  In addition, when considering an individual for parole, section 3051 directs the Board or Governor to release the individual on parole as provided in section 3041, except that the Board and/or Governor also is to "give great weight to the diminished culpability of juveniles as compared to adults, the hallmark features of youth, and any subsequent growth and increased maturity of the prisoner in accordance with relevant case law." (§ 4801, subd. (c); see § 3051, subd. (d).)  Accordingly, although

12

section 3051 provides additional factors for the Board and/or Governor to consider, it does not otherwise alter the suitability factors that inform a parole decision.

The decision whether to grant parole is an inherently subjective determination (*In re Rosenkrantz* (2002) 29 Cal.4th 616, 655 (*Rosenkrantz*)) that is guided by a number of factors, some objective, identified in section 3041 and the Board's regulations. (Cal. Code Regs., tit. 15, §§ 2281, 2402.) In making the suitability determination, the Board must consider "[a]ll relevant, reliable information," such as the nature of the commitment offense including behavior before, during, and after the crime; the prisoner's social history; mental state; criminal record; attitude towards the crime; and parole plans. (Cal. Code Regs., tit. 15, § 2402, subd. (b).) The circumstances that tend to show unsuitability for parole include that the inmate: (1) committed the offense in a particularly heinous, atrocious or cruel manner;[5] (2) possesses a previous record of violence; (3) has an unstable social history; (4) has previously sexually assaulted another individual in a sadistic manner; (5) has a lengthy history of severe mental problems related to the offense; and (6) has engaged in serious misconduct while in prison. (Cal. Code Regs., tit. 15, § 2402, subd. (c).) A factor that alone might not establish unsuitability for parole

---

[5]    Factors that support the finding the crime was committed "in an especially heinous, atrocious or cruel manner" (Cal. Code Regs., tit. 15, § 2402, subd. (c)(1)), include the following: (A) multiple victims were attacked, injured, or killed in the same or separate incidents; (B) the offense was carried out in a dispassionate and calculated manner, such as an execution-style murder; (C) the victim was abused, defiled, or mutilated during or after the offense; (D) the offense was carried out in a manner which demonstrates an exceptionally callous disregard for human suffering; and (E) the motive for the crime is inexplicable or very trivial in relation to the offense. (*Ibid.*)

13

may still contribute to a finding of unsuitability. (Cal. Code Regs., tit. 15, § 2402, subd. (b).)

Circumstances tending to show suitability for parole include that the inmate: (1) does not possess a record of violent crime committed while a juvenile; (2) has a stable social history; (3) has shown signs of remorse; (4) committed the crime as the result of significant stress in his life, especially if the stress had built over a long period of time; (5) committed the criminal offense as a result of battered woman syndrome; (6) lacks any significant history of violent crime; (7) is of an age that reduces the probability of recidivism; (8) has made realistic plans for release or has developed marketable skills that can be put to use upon release; and (9) has engaged in institutional activities that indicate an enhanced ability to function within the law upon release. (Cal. Code Regs., tit. 15, § 2402, subd. (d).)

These criteria are "general guidelines," illustrative rather than exclusive, and " 'the importance attached to any circumstance or combination of circumstances in a particular case is left to the judgment of the [Board or Governor].' " (*Rosenkrantz, supra,* 29 Cal.4th at p. 654; § 2402, subds. (c), (d).) Thus, the endeavor is to try "to predict by subjective analysis whether the inmate will be able to live in society without committing additional antisocial acts." (*Rosenkrantz, supra,* at p. 655.) Because parole unsuitability factors need only be found by a preponderance of the evidence, the Governor is free to consider facts apart from those found true by a jury or judge beyond a reasonable doubt. (*Id*. at p. 679.) Nonetheless, the Governor's decision, like the Board's decision, must comport with due process. (*Id.* at p. 660.)

14

B.  Judicial Review

In *Rosenkrantz*, the California Supreme Court addressed the standard for a court to apply when reviewing a parole decision by the executive branch.  The court held that "the judicial branch is authorized to review the factual basis of a decision of the Board denying parole . . . to ensure that the decision comports with the requirements of due process of law, but that in conducting such a review, the court may inquire only whether some evidence in the record before the Board supports the decision to deny parole, based on the factors specified by statute and regulation."  (*Rosenkrantz, supra,* 29 Cal.4th at p. 658.)  *Rosenkrantz* further held that the same standards of review are applicable when a court reviews a Governor's decision reversing the Board.  (*Id.* at pp. 658-667.)

In conducting this independent review of the Governor's decision, "[i]t is irrelevant that a court might determine that evidence in the record tending to establish suitability for parole far outweighs evidence demonstrating unsuitability for parole."  (*Rosenkrantz, supra,* 29 Cal.4th 616, 677.)  Although a court must ensure that the Governor considered the same factors the Board considered, "the court's review is limited to ascertaining whether there is some evidence in the record that supports the Governor's decision."  (*Ibid.*)

In *In re Lawrence* (2008) 44 Cal.4th 1181 (*Lawrence*), our Supreme Court reaffirmed its analysis in *Rosenkrantz, supra,* 29 Cal.4th 616, that the Governor's decision of parole suitability is subject to the "some evidence" standard of review.  (*Lawrence, supra,* at p. 1205.)  However, in doing so it recognized that *Rosenkrantz's* characterization of that standard as extremely deferential and requiring "[o]nly a

15

modicum of evidence" (*Rosenkrantz, supra,* at p. 677), had generated confusion and disagreement among the lower courts "regarding the precise contours of the 'some evidence' standard." (*Lawrence, supra*, at p. 1206.) The court in *Lawrence*, recognizing that the legislative scheme contemplates "an assessment of an inmate's *current* dangerousness" (*id*. at p. 1205; original italics), clarified that the analysis required when reviewing a decision relating to a prisoner's current suitability for parole is "whether some evidence supports the *decision* of the Board or the Governor that the inmate constitutes a current threat to public safety, and not merely whether some evidence confirms the existence of certain factual findings." (*Id*. at p. 1212; original italics.)

As to this standard, the court in *Lawrence* further explained that although it was "unquestionably deferential, [it was] certainly . . . not toothless, and 'due consideration' of the specified factors requires more than rote recitation of the relevant factors *with no reasoning establishing a rational nexus between those factors and the necessary basis for the ultimate decision*--the determination of current dangerousness." (*Lawrence, supra,* 44 Cal.4th at p. 1210, italics added.) Because consideration of public safety is the primary statutory issue to be determined in deciding whether an inmate should be granted parole (§ 3041, subd. (b); *Lawrence, supra*, at p. 1205), "[t]his inquiry is, by necessity and by statutory mandate, an individualized one," and requires a court to consider the circumstances surrounding the commitment offense, along with the other facts in the record, to determine whether an inmate poses a current danger to public safety. (*In re Shaputis* (2008) 44 Cal.4th 1241, 1254-1255 (*Shaputis I*).)

16

Regarding such consideration, "although the Board and the Governor may rely upon the aggravated circumstances of the commitment offense as a basis for a decision denying parole, the aggravated nature of the crime does not in and of itself provide some evidence of *current* dangerousness to the public unless the record also establishes that something in the prisoner's pre- or postincarceration history, or his or her current demeanor and mental state, indicates that the implications regarding the prisoner's dangerousness that derive from his or her commission of the commitment offense remain probative of the statutory determination of a continuing threat to public safety." (*Lawrence*, *supra*, 44 Cal.4th at p. 1214; original italics.)

The current petition for habeas relief is an original proceeding that requires we independently review the record to determine whether there is some evidence to support the Governor's decision in reversing the Board's grant of parole for Wimberly. (*In re Scott* (2004) 119 Cal.App.4th 871, 884.) In other words, "we independently review the record [citation] to determine 'whether the identified facts [by the Governor] are probative to the central issue of current dangerousness when considered in light of the full record before [him].' " (*Vasquez, supra*, 170 Cal.App.4th at pp. 382-383.)

### C. Analysis

The Governor's decision in reversing the Board's grant of parole was based on two related factors, the circumstances of the commitment offense, which the Governor found to be "shocking," and Wimberly's lack of insight into why he committed that offense. Specifically, the Governor referred to evidence suggesting the killing demonstrated "a cruel and callous disregard for human suffering."

17

The Governor described Wimberly's life crime as "shocking," "brutal[]," "cruel," and "callous." While we do not ascribe any talismanic qualities to the Governor's use of these words, the law is clear that a factor showing an inmate is unsuitable for parole is the Governor finding the life offense was committed "in an especially heinous, atrocious or cruel manner." (Cal. Code Regs., tit. 15, § 2402, subd. (c)(1); *Rosenkrantz*, *supra*, 29 Cal.4th at p. 654.) However, this factor alone does not support the Governor's reversal of the Board's decision to grant parole.

The commitment offense predates incarceration and is immutable. In *Lawrence*, *supra*, 44 Cal.4th 1181, the court explained that parole for murderers is the rule, not the exception, and therefore, the immutable aggravated circumstances of an offense alone rarely will provide a valid basis to deny parole after an inmate has served the suggested base term and when there is strong evidence of rehabilitation and no other evidence of current dangerousness. (*Id*. at pp. 1211, 1218-1219.) Under such circumstances, the aggravated nature of the offense realistically loses probative value to show current dangerousness unless there is other, more recent evidence reasonably indicating that the offense still has some tendency to show that the inmate poses a risk of harm to others. (*Id.* at pp. 1214, 1219.)

Here, the Governor did not articulate how the life offense indicates that Wimberly would be a current danger to the public if paroled. Certainly the circumstances of Wimberly's commitment offense are despicable and fully justify Wimberly's guilty plea and sentence for first degree murder. These circumstances alone, however, are not "some evidence" supporting the Governor's denial of parole. The inquiry into current

18

dangerousness "cannot be undertaken simply by examining the circumstances of the crime in isolation, without consideration of the passage of time or the attendant changes in the inmate's psychological or mental attitude." (*Lawrence*, *supra*, 44 Cal.4th at p. 1221.) We find nothing in the record showing the Governor's reasoning establishing a rational nexus between the life offense and the determination of current dangerousness. (*Id.* at p. 1210.)

The Attorney General does not argue that the circumstances of Wimberly's life crime validate the Governor's reversal standing alone. Instead, the Attorney General focuses her argument on the Governor's finding that Wimberly lacks insight into his behavior causing him to commit his offense and maintains that it provides the "rational nexus" for concluding that Wimberly would be a danger to society if released. In addition, the Attorney General insists Wimberly's insufficient insight makes the circumstances of his life crime probative to his current risk of danger to society if paroled. We reject these contentions.

A prisoner's insight into his offenses and his understanding of the nature, magnitude and causes of his crime are important parole suitability factors. (*In re Rodriguez* (2011) 193 Cal.App.4th 85, 97.) Further, a "petitioner's current attitude toward the crime constitute[s] [a] factor[] indicating unsuitability for parole." (*Shaputis I*, *supra*, 44 Cal.4th at p. 1246.) A conclusion that a petitioner remains dangerous and is unsuitable for parole can be supported by evidence that, among other things, the petitioner "is unable to gain insight into his antisocial behavior despite years of therapy and rehabilitative 'programming.' " (*Id*. at p. 1260.) However, expressions of

19

insight and remorse will vary from inmate to inmate and there are no special words for an inmate to articulate to communicate he or she has committed to ending a previous pattern of violent or antisocial behavior. (*Id*. at p. 1260, fn. 18.)

"Evidence of lack of insight is indicative of a current dangerousness only if it shows a material deficiency in an inmate's understanding and acceptance of responsibility for the crime. To put it another way, the finding that an inmate lacks insight must be based on a factually identifiable deficiency in perception and understanding, a deficiency that involves an aspect of the criminal conduct or its causes that are significant, and the deficiency by itself or together with the commitment offense has some rational tendency to show that the inmate currently poses an unreasonable risk of danger." (*In re Ryner*, (2011) 196 Cal.App.4th 533, 548-549; italics & fn. omitted.)

Although case law is clear the Governor can consider a petitioner's lack of insight of the life offense, it is obscure regarding the proper role of this nonstatutory factor for assessing suitability for parole.

More recently, the Supreme Court discussed the "lack of insight" on the part of inmates and how the Governor or parole authorities may use lack of insight in parole decisions. (*In re Shaputis* (2011) 53 Cal.4th 192 (*Shaputis II*).) In that case, the court reaffirmed the requirement of judicial deference to executive branch decisions regarding paroles. The court noted parole authorities can use "insight" as a basis of a parole denial and that judicial review is limited to determining whether there is a modicum of evidence to support the executive decision. (*Id.* at pp. 212-213.) The court also noted that in the wake of its decisions in *Lawrence, supra,* 44 Cal.4th 1181 and *Shaputis I, supra,* 44

20

Cal.4th 1241—which "reoriented the focus of parole suitability review, making it clear that the inmate's current dangerousness is the crucial determination"—parole authorities were giving greater attention to lack of insight as a basis for this determination. (*Shaputis II, supra,* at p. 217; italics omitted.) Although "[c]onsideration of an inmate's degree of insight is well within the scope of the parole regulations" (*id.* at p. 218) that direct the Board to consider such factors as past and present attitude towards the crime, the presence of remorse and whether the inmate understands the nature and magnitude of the offense, " 'lack of insight, like any other parole unsuitability factor, supports a denial of parole only if it is rationally indicative of the inmate's current dangerousness.' " (*Id*. at p. 226 (conc. opn. of Liu, J.).)

*Shaputis II, supra,* 53 Cal.4th 192, however, does not require us to defer, absent any review, to the Governor's decision based on lack of insight. Instead, the "some evidence" standard requires us to uphold the Governor's interpretation of the evidence "if it is reasonable, in the sense, that it is not arbitrary, and reflects due consideration of the relevant factors." (*Id*. at p. 212.)

We acknowledge that is not our role to reweigh the evidence presented at the parole hearing or considered by the Governor. (See *In re Shigemura* (2012) 210 Cal.App.4th 440, 457.) However, we observe that a mountainous amount of evidence of insight exists in the record.

Wimberly articulated to the Board and psychologists who assessed the factors that led him to murder Lauterbach and Liebrenz. Wimberly was an immature, vulnerable 17 year old, struggling with his sexuality, and isolated from his parents and peers. He was

21

molested as a child, bullied at school, and frightened by his father's homophobia. He suffered from feelings of guilt, shame, humiliation, low self-esteem, hopelessness, and thoughts of suicide. He felt victimized and blamed others for his problems.

Eric Lauterbach was Wimberly's only friend and Wimberly became attracted to him. Wimberly agreed to help Eric kill his father and his father's girlfriend in a desperate, irrational, and immature attempt to win Eric's affection and tie him and Eric together forever. Wimberly used talk of the killings to become closer to Eric and gain his trust. He did not think about the consequences of the plan, and he did not appreciate the reality of killing two people. Motivated by his imprudent desire to please Eric and earn his favor, fueled by anger and rage built up over his childhood, and reflecting his deep inner turmoil and personality problems, Wimberly went forward with the murders by himself. And, by his most recent parole hearing, after spending over 35 years incarcerated, Wimberly finally realized and conveyed that he equated killing the victims to killing his own parents.

In addition, the three doctors who assessed Wimberly found that he had insight into his crime. In fact, the most recent assessor (Hayward) went into great detail regarding Wimberly's significant insight. Also, the Board emphasized the insight Wimberly had gained into the causative factors of his life crime and indicated that it did not have any reservations about Wimberly's insight.

Yet, despite the wealth of evidence in the record regarding Wimberly's insight, we are surprised how little the Governor addressed this evidence. Only adding to our astonishment, we note the Attorney General eschews any real discussion of this evidence.

22

We find these omissions a fundamental shortcoming in both the Governor's reversal and the Attorney General's arguments before us.

Here, the Attorney General maintains that the Governor's conclusion that Wimberly lacks insight is explained because "Wimberly's superficial desire to 'cement [his] relationship' with Eric does not adequately explain why he would kill two people 'in cold blood' with the type of violence and depravity Wimberly demonstrated when he stabbed both victims 14 times each." In essence, both the Governor and the Attorney General either ignore or simply gloss over the other explanations Wimberly offers regarding why he committed his life crime and reduce his insight into a single motivational factor: Wimberly killed his two victims only to improve his relationship with Eric. Such a conclusion is not supported on the record before us.

In addition, we find it telling that the Attorney General attempts to justify the Governor's finding of a lack of insight by focusing on the brutal nature of the life crime and the facts surrounding the murders at the time they were committed. Indeed, much of the evidentiary support on which the Attorney General relies is found in Wimberly's statement to the police, the events surrounding and leading to the life crime, and Wimberly's testimony at the 2012 parole hearing. And when the Attorney General does cite to Hayward's assessment of Wimberly, she ignores almost two and one-half pages of analysis regarding Hayward's conclusion that Wimberly has significant insight into the causative factors of his life crime.

In addition, in lieu of addressing Wimberly's explanation of his insight, the Attorney General argues that Wimberly's testimony at the most recent parole hearing

23

contradicts his testimony at previous hearings. For example, the Attorney General points out that in a 2009 parole hearing, Wimberly told the Board that he had been bullied his whole life and it was his "desire to get back at those bullies that manifested itself on that night, that enabled [him] to actually do the violence." Wimberly also discussed the impact of the bullies during his most recent parole hearing. He noted his problem during his teenage years with "internalized anger" and that "[w]hen [he] was bullied at school," he had "anger . . . toward the bullies." During his most recent parole hearing, this internalized anger that was fueled by the bullies was part of his explanation for why he committed the murders. Thus, we do not find that his testimony in the most recent hearing was inconsistent with his prior testimony in the 2009 hearing. Instead, it appears that Wimberly's comments became more insightful and developed.

The Attorney General also identifies as inconsistent Wimberly's response during his parole hearing in 2012 to the question, "Did you hate your father?" Wimberly responded, "No, no, but I there was just those family dynamic issues, I think, that were going on." But Wimberly continues to explain that he believed that Eric's situation with his father was worse than his own. In addition, Wimberly explained that everything his parents did was out of love and concern, but that he put the wrong twist on it.

In the most recent parole hearing, Wimberly stated that he engaged in further insight since the 2012 parole hearing and explained that he was angry at his parents and projected that anger onto Eric's father and girlfriend. Although the Attorney General implies that Wimberly's most recent testimony about his parents contradicts the testimony he provided in 2012, the Attorney General offers no reasoning to support her position.

24

Indeed, Wimberly's testimony seems entirely consistent and indicative of someone who has grappled with trying to understand why he committed such a heinous crime.

Also, it is apparent that the Attorney General, in defending the Governor's reversal, does not consider the entire record before us. For example, the Attorney General contends that Wimberly has not adequately explained or addressed why murdering the victims was "necessary" to "cement" his relationship with Eric, particularly if the thought of killing them was "just a fantasy." During the 2012 parole hearing, Wimberly referred to talking to Eric about killing his father and girlfriend like being in "fantasy land" and that "reality [was] not clicking." But Wimberly continued during that hearing to explain about his sexual encounter with Eric, Eric rejecting him after that encounter, and Wimberly doing whatever he could do to revive his relationship with Eric. He also explained how the thoughts of killing became an actual plan. Further, Wimberly explained that he had difficulty understanding the consequences of such a plan: "It never occurred to me that they were human beings and that their life had value, and that I was about to take their lives." And he clarified that "[i]t was fantasy land" because of his mindset that he "brought [from] childhood in hating my own life, and really blaming everybody else and everybody around me. And that just brought me to the place where I didn't care about anybody else's life either, you know."[6] The Attorney General appears to overlook Wimberly's explanation in 2012 regarding how the fantasy of discussing killing Lauterbach and Liebrenz became a reality.

---

[6]     Wimberly offered a similar explanation to Hayward.

The Attorney General also attempts to justify the Governor's reversal on the grounds that Wimberly's desire to "cement [his] relationship" by killing two people was "superficial." But as Wimberly points out, reasons that may seem superficial and inadequate do not necessarily mean that his insight is lacking. Instead, it appears that the Governor is most troubled by Wimberly's explanation for killing two innocent people or simply does not understand why Wimberly did it. However, as Wimberly explains, "There *is* no adequate explanation for murdering two innocent people." (Original italics.)

Or perhaps the Governor is concerned that Wimberly lacks sufficient insight. To this end, the Governor frames Wimberly's reason "he resorted to murder solely for the purpose of maintaining a friendship, however intense." In other words, the Governor completely ignores or discounts the multitude of factors Wimberly discusses regarding why he committed his life crime, and instead, looks at Wimberly's desire to continue his friendship with Eric as the *only* explanation for the murders. There is no explanation in the Governor's reversal or the Attorney General's return why the rest of Wimberly's explanation was rejected. Moreover, we find nothing in the record to support this extremely limited view of the evidence of insight. "Of course, personal insight has long been recognized as a worthy goal. However, we have to question whether anyone can ever fully comprehend the myriad circumstances, feelings, and current and historical forces that motivate conduct, let alone past misconduct. Additionally, we question whether anyone can ever adequately articulate the complexity and consequences of past misconduct and atone for it to the satisfaction of everyone. Indeed, the California Supreme Court has recognized that 'expressions of insight and remorse will vary from

26

prisoner to prisoner and . . . there is no special formula for a prisoner to articulate in order to communicate that he or she has gained insight into, and formed a commitment to ending, a previous pattern of violent behavior.' [Citation.] More importantly, in our view, one always remains vulnerable to a charge that he or she lacks sufficient insight into some aspect of past misconduct even after meaningful self-reflection and expressions of remorse. Moreover, we consider the very concept of 'insight' to be inherently vague and find that whether a person has or lacks insight is often in the eye of the beholder. Hence, although a 'lack of insight' may describe some failure to acknowledge and accept an undeniable fact about one's conduct, it can also be shorthand for subjective perceptions based on intuition or undefined criteria that are impossible to refute. [Citation.] However, it is settled that the [Governor] may not base [his] findings on hunches, speculation, or intuition. [Citations.]" (*In re Ryner*, *supra*, 196 Cal.App.4th at p. 548.)

We find that the evidence in the record before us does not support the Governor's finding that Wimberly lacks insight into the causative factors of his life crime. "Where, as here, undisputed evidence shows that the inmate has acknowledged the material aspects of his or her conduct and offense, shown an understanding of its causes, and demonstrated remorse, the Governor's mere refusal to accept such evidence is not itself a rational or sufficient basis upon which to conclude that the inmate lacks insight, let alone that he or she currently remains dangerous." (*In re Ryner*, *supra*, 196 Cal.App.4th at p. 549.)

27

In sum, we have searched the record and have determined that the Governor's decision to reverse the Board's finding that Wimberly is suitable for parole is not supported by the requisite "some evidence" that Wimberly currently presents an unreasonable risk of danger to the public if released on parole. Because we reach this conclusion, we do not address Wimberly's additional argument that the Governor's finding on insight ignores section 3051's factors.

DISPOSITION

The Governor's decision to reverse the Board's 2014 order granting Wimberly parole is vacated, and the Board's parole release order is reinstated. In the interests of justice, this opinion is made final as to this court seven days from the date of filing. (Cal. Rules of Court, rule 8.387(b)(3)(A).)

HUFFMAN, Acting P. J.

WE CONCUR:

NARES, J.

McINTYRE, J.